## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARTHUR RICHARD JOYCE** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **OFFICE OF THE ARCHITECT OF** ) | |
| **THE CAPITOL** ) | |
| ) | |
| **Defendant,** ) | **Case No._____** |
| ) | |
| **Serve: HON. STEPHEN AYERS** ) | |
| **Architect of the Capitol** ) | |
| **(in his official capacity)** ) | |
| ) | |
| **Serve: HON. RONALD C. MACHEN JR.** ) | |
| **United States Attorney for the** ) | |
| **District of Columbia** ) | |
| ) | |
| **Serve: Attorney General of the United States** ) | |
| **Hon. Eric Holder or his** ) | |
| **Designated representative** ) | |
| ) | |
| ) | |

## CIVIL COMPLAINT FOR EQUITABLE
## AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

### Introduction

1.      Arthur Richard Joyce ("Joyce") built himself a successful thirty-nine year career

at the Office of the Architect of the Capitol ("AOC") until his constructive termination in 2012.

2.      Since 2006, several of Joyce's family members, and Joyce himself had to deal

with serious health issues.

3.      In 2006, Joyce's management began challenging his leave requests.

4.      In 2011, the AOC denied Joyce's request for a Flexible Work Schedule ("FWS") claiming that he had not established a pattern of regular work attendance even though at the time of his request he had an annual leave balance of 258.5 hours and a sick leave balance of 459.5 hours.

5.      Joyce's management repeatedly undermined his decisions and made it impossible for Joyce to do his job effectively.

6.      In 2012, Joyce took Family and Medical Leave Act ("FMLA") protected leave to recover from a back injury.

7.      Immediately upon his return to work, the AOC significantly changed Joyce's shift and tour of duty which made Joyce unable to care for his pre-school aged grandchildren and led directly to his constructive termination.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the law of the United States, specifically, the Congressional Accountability Act, 2 U.S.C. § 1311.

9.      This Court also has jurisdiction pursuant to the Congressional Accountability Act's express statement of jurisdiction, 2 U.S.C. § 1408.

10.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because this is the judicial district where the unlawful employment practices are alleged to have been committed and because the Office of the Architect of the Capitol is located in this judicial district.

## PARTIES

11.     Plaintiff Joyce resides in Maryland at 10602 Manor Lake Terrace, Mitchellville,

Maryland, 20721.  He is a proper plaintiff in this matter as he is an "employee" of the Architect

of the Capitol as defined in 2 U.S.C. § 1301(3)(F).

12.     Defendant AOC is located at the United States Capitol Building, Washington, DC

20515.  AOC is a proper defendant in this matter as it is an "employing office" as defined in 2

U.S.C. § 1301(9)(D).


## FACTUAL ALLEGATIONS

**Until His Constructive Termination In 2012, Joyce Had An Approximately Thirty-Nine
Year Career With The AOC.**

13.     Joyce began his employment with the AOC in 1973.

14.     Joyce worked for the AOC in various capacities for the past approximately thirty-

nine years.

15.     From 2000 until approximately April 2012, Joyce served as the Facilities

Supervisor for the Labor and Custodial Branch ("LCB") within the Client Services Division

("CSD") at the AOC Senate Office Buildings.

16.     Joyce managed both the day and night shift.

17.     From approximately 2000 through 2012, Joyce worked a shift from 4:00 a.m. to

12:30 p.m. (or until 1:30 p.m. when Joyce worked a Flexible Work Schedule) that overlapped the

night and day shift.  The night shift is from 10:00 p.m. to 7:00 a.m. and the day shift is from 5:00

a.m. to 6:00 p.m.

18.     Joyce had oversight responsibilities for approximately 250 employees.

19.     From approximately 2006 through late 2009 or early 2010, Joyce reported directly to Assistant Superintendent Dennis Campbell ("Campbell").  Campbell headed the CSD.

20.     Until he began working for Campbell, Joyce received "outstanding" performance evaluations each year since performance evaluations were implemented in approximately 2000.


**Starting In 2006, Several Of Joyce's Family Members, And Joyce Himself Had To Deal With Serious Health Issues.**

21.     In 2006, Joyce requested leave to help care for his wife who was admitted to the hospital for leg surgery.

22.     In 2008, Joyce was diagnosed with diabetes and high blood pressure.

23.     In 2009, Joyce's wife became ill with a condition that doctors were unable to diagnose.  She had episodes where she became dizzy and was unable to function independently.

24.     In 2010, Joyce's daughter was placed on immediate bed rest four months into her pregnancy with twins, and she was labeled as a "high risk" pregnancy.  Joyce's daughter moved into his house and Joyce became one of her primary caregivers.  Her pregnancy required three separate emergency hospitalizations.

25.     When Joyce's twin grandchildren were born, Joyce acted as a primary caregiver. As the facilities supervisor, his nighttime to early morning schedule allowed him to watch his infant grandchildren during the day while his daughter worked.

26.     In 2012, Joyce required leave to recover from a back injury.


**The AOC Repeatedly Challenged And Disapproved Joyce's Leave Requests.**

27.     On multiple occasions, Joyce attempted to take sick leave to care for himself and his family members, but AOC management repeatedly denied these requests.

28.     On June 30, 2006, Joyce requested sick leave from July 3, 2006 to July 10, 2006 to care for his wife during her leg surgery.

29.     At the time of the request, Joyce had over 1,000 hours of unused sick leave.

30.     Campbell denied Joyce's sick leave in advance stating that Joyce did not have the documentation required to take a period of leave greater than twenty four hours.

31.     On June 30, 2006, Joyce contacted Campbell's supervisor, AOC Senate Office Buildings Superintendent, Robin Morey ("Morey") and stated:

> I must state for the record that Mr. Campbell's denial of my Sick Leave request to be personally motivated and is not in line with how leave in [*sic*] approved by other division supervisors or other Superintendents for that matter.
>
> Currently I have nearly 1,300 hours of Sick Leave and have **always** followed the AOC Leave Policy and have saved my leave for just this kind of use. As I stated during our recent meeting (about these kinds of decision), it was my intention to regroup physically, mentally, and emotionally and was flying out of town to also seek council about my future employment with the Architect's office. I must speculate this decision was intended to circumvent this effort . . . .
>
> This in my opinion this is not a personality conflict but a manger's blind course of action to hold me and my staff to policies, standards and conduct not universally applied . . . . I believe my past performance concerning leave should have easily allowed me to self certify by [*sic*] absence.

32.     Joyce also contacted AOC Human Resources to inquire about self-certification policies and whether a supervisor had discretion to approve more than twenty-four hours of sick leave.  Joyce received an out of office reply.

33.     "Self-certification" is a process that allows employees to certify that they were sick without providing a doctor's note.

34.     Joyce proceeded to take twenty-four hours of sick leave from July 5, 2006 through July 7, 2006, to comply with Campbell's restriction of only being able to approve twenty-four hours of leave.

35.     On July 10, 2006, Joyce submitted a sick leave request for July 11, 2006 through July 14, 2006 to continue to care for his wife during her leg surgery.

36.     Campbell again denied this request in advance and stated that he could not approve sick leave exceeding twenty four hours.

37.     Due to Joyce's wife's medical needs, Joyce was forced to take unapproved leave.

38.     On July 18, 2006, Campbell issued a counseling letter to Joyce about his use of sick leave:

> Due to recent events, I am concerned about your use of unscheduled leave and would like to remind and reinforce the proper procedures you must use when requesting leave . . . . Since you did not get prior approval for your leave, HR policy# 630-1 requires you to personally call me each day to report on your absence. You have failed to do so on both occasions. Upon your return to work yesterday, you have failed to produce any form of medical documentation to explain your absence last week. As a result, I have no choice but to charge you AWOL (absent without leave).

39.     On August 4, 2006, Joyce sent Campbell a formal response to his counseling letter, and provided his wife's medical records for his July leave.  Joyce's response stated "I believe my [sick leave] documentation to be appropriate and justified my absence to care for my wife after surgery and her convalescence . . . . this course of action [is] completely unwarranted and other than my recent grievance I'm at a loss why."

40.     Joyce also provided a point-by-point counter to Campbell's counseling and requested that Campbell remove the counseling letter from his records.  Joyce countered Campbell's letter with the following statements:

- I considered this leave approved in advance based on our meeting and e-mails.
- This leave was not charged as AWOL (without approval) but was carried 24 hours Annual Leave (not requested by me).
- I changed the time from 40 to 24 hours to comply (I thought) with your restrictions.  I did however forget to submit a new leave slip for the 24 hours of Sick Leave.  I acknowledge this was an error on my part, but was not insubordination just simply it was Friday of an early dismissal and I forgot.
- I did **respectfully** ask "If you would please give me your leave decision even if disapproval, for documentation purposes:" This was done so I could be clear what your position was on self certification and since you didn't want to consult with Human Resources I wanted to, and did . . .
- I did "*proceed to take four consecutive days without approval*", in fact you called me while I was at the hospital and stated "you took off after I denied your leave"? I stated regardless of your 24 hour limitation, I still had to take the leave.

41.     In March of 2007, Joyce requested sick leave to attend his father-in-law's funeral.

42.     Campbell changed the sick leave request to a combination of sick and annual leave and requested proof of Joyce's father-in-law's death.

43.     On March 22, 2007, Joyce produced an obituary and an original program from the funeral.

44.     Joyce's wife also sent an email to Campbell further detailing the leave and expressing her disgust and disappointment with the AOC for requiring such information.

45.     Campbell ultimately changed Joyce's leave status from annual leave to sick leave.

46.     In 2009, Joyce's wife became ill with a condition that doctors were unable to diagnose, and she required assistance in performing her daily life activities.

47.     In March of 2009, Joyce requested FMLA leave to care for his wife and provided documentation from doctors.

**The AOC Admits That It May Be Denying Joyce's Requests Because It Believes That Joyce Will Retire Soon.**

48.    In early 2011, Jean Gilles ("Gilles") replaced Dennis Campbell as Assistant Superintendent and continued to disapprove Joyce's legitimate leave requests.  Gilles and Campbell were friends outside of their professional relationship at AOC.

49.    On June 21, 2011, Gilles denied Joyce's request for a flexible work schedule ("FWS").

50.    At the time of the FWS request, Joyce had an annual leave balance of 258.5 hours and a sick leave balance of 459.5 hours.

51.    Gilles stated that Joyce had not established a pattern of regular work attendance, "Based on your leave record, you have not established a pattern of regular work attendance. Specifically, your sick and annual leave balances are very low considering your accrual rate and the amount of time you have been employed here."

52.    Morey also stated to Joyce that Joyce's previous FMLA requests for his back injury and to care for his wife had been "denied."

53.    AOC identified no policy that defined the level of leave required to receive approval for a FWS.

54.    Joyce confronted Morey about the FWS denial, and Joyce stated that Morey was operating under the mistaken belief that Joyce was using his leave in preparation for retirement.

55.    Morey acknowledged that "might" be his perception.


**The AOC Has A History Of Undermining Joyce's Decisions.**

56.    Joyce was a fair manager who consistently looked out for his employees.

57.     On multiple occasions, Joyce voiced his concerns to upper management regarding their decisions and discipline style.

58.     In 2006, Joyce suggested that his boss host regular meetings between the night workers and inspectors to bridge a gap between the two groups and reinforce a team feeling.

59.     Joyce became concerned when these meetings turned away from team building and instead became accusatory of the night workers.  On June 9, 2006, in an email to Campbell, Joyce wrote:

> Originally when I suggested these meeting it was to bridge what I thought was a growing gap in and to improve communications with Night Leadership and the Inspectors and re-enforce [sic] the **same team** thinking.  And the first meeting briefly addressed these issues and at least pointed in that direction.  However the last (3) three meeting have dealt exclusively with Night Cleaning (directives, critics, warnings, expectations etc).  And while that might be needed, the presence of the Inspectors seems inappropriate and could be counter productive to the intent of the meetings.  Particularly when discussing possible discipline of the leadership of Night Leadership.
>
> *Suggestion: Concentrate of team building as the prior and limit discussions to action items that effect [sic] both groups. You could attend Night supervisor meeting and be afforded whatever time you might need to address your concerns. Or finally have your own additional meeting and exclude outside participants when dealing with internal issues.*

60.     On June 26, 2006, after Joyce redistributed daily assignments because an employee took sick leave, one of Joyce's subordinates complained to Campbell about her workload.

61.     Campbell directed Joyce to assign work "evenly and fairly on a rotating basis." Joyce responded:

> I believe this to be a serious undermining of my authority and interference with managements [sic] right to assign work (what employee hardship as [sic] been established).  As I've stated in

> recent e-mails that you have no confidence in my ability to manage
> and it's has negatively impacted on my effectiveness.

62.     Later on June 26, 2006, Joyce sent Morey an email stating that he was removing

himself from participation in discipline matters in areas in which he had oversight because he

was uncomfortable with the direction of the discipline process:

> Per our discussion I'm removing myself from further participation
> concerning discipline within the groups I have oversight
> (Labor/Custodial both Day/Night).  As I stated, I'm growing more
> uncomfortable with the direction and what appears to be stalling
> tactic.  I don't think it's appropriate for me to continue in a process
> that I personally don't think the agency is committed to and find it
> unfair that every delay is somehow reversed and attributed to my
> team.

63.     The next day, on June 27, 2006, Joyce emailed Campbell requesting further

guidance and explaining that Campbell's repeated undermining of Joyce's decisions was

affecting Joyce's ability to properly manage:

> I respectfully disagree that to issue directives and instructions
> without communications or providing for feedback is in my
> opinion setting me up to fail.  Additionally, assigning work in the
> Labor Division is a challenge to say the least, but to have your ever
> [*sic*] decision second guessed and your efforts criticized without
> any direction or support or any real leadership makes my position
> tenable.
>
> Therefore again, please define "evenly and fairly and on a rotating
> basis" in comparison with what we now do?  I stated that I would
> not manage based solely on complaints, regardless if they're
> generated thru anonymous Employee Feedback or private meeting
> you have with disgruntled employees.  Obviously your directives
> state immediately so I will relay my understanding (such as it is)
> with supervision, but request your participation in correcting
> unfairness in our decision making.

64.     On September 13, 2007, Joyce counseled an uncooperative and unhappy

subordinate employee.  After the meeting, the employee slammed Joyce's office door and told

the team scheduler, "put me on leave because I'm gone for the day."

10

65.     Joyce informed the employee that her manner of requesting sick leave was not acceptable and that she had to properly submit a sick leave request.

66.     In direct contradiction to Joyce's instructions, Campbell later approved the employee's sick leave.

67.     On September 14, 2007, Joyce wrote an email to Campbell about this situation and stated:

> First let me start with how objectionable I found your circumventing leadership in the execution of their duties yesterday . . . . The prospect of being undermined in that kind of setting is something I'm not prepared to subject myself or supervisors to . . . . There is clearly a defiant, uncooperative and unprofessional atmosphere and to a man (leadership) believes your interaction with employees is a large part of that.  The perception is any accusation or rumor is taken at face value and supervision is put on trail [sic] with a magnifying scope.  You continue to meet, make decision, change or over rule decisions purely on the work [sic] of disgruntled employees.  There are confirmed meeting among these employees to discuss plans to "get" Ms. Simms and others.

68.     Campbell continued to overrule decisions by front-line supervisors and did not support Joyce's discipline of problem employees.

69.     Joyce and other employees were distraught by the work environment Campbell created.

70.     On April 2, 2008, Joyce emailed Deputy Superintendent Takis Tzamaras ("Tzamaras") stating that Campbell was undermining Joyce in discussions with other employees. Joyce informed Tzamaras that employees and supervisors were concerned about the hostile work environment that Campbell was creating, and at least one employee was filing an Equal Employment Opportunity ("EEO") complaint:

> I've attempted to remain silent or at least minimize my concerns to outside authority about what I believe to be an impossible work environment me and my subordinate employees are now subjected.

I've tried to document what I consider to be unfair or disparate treatment.  Additionally I've alert senior leadership to this growing hostile (for lack of a better word) environment with limited success to date.  Today, I believe to remain silent would represent my participation in this environment.  Obviously my concerns can't all be included in this e-mail, so this should serve as my official request for relief.

Mr. Dennis Campbell today in my opinion engaged in intimidating conduct and clearly has an agenda to undermine all efforts I've made to manage Labor and Custodial operations.  His interaction with (Day) Labor leadership (and to a lesser extent Night operations) can only be described as abusive.  This conduct has resulted in employee and supervisors expressing concerns that the hostile environment is effecting their health and at lest one employee filing their concerns with EEO.  I personally will attest to my observations and encourage the appropriate resource to interview members of my staff.  Mr. Campbell has engaged in what can only be described as assassination of my character by suggesting and secretly soliciting rumors and gossip about my activities on the job.

Today I witnessed Mr. Campbell conversation with Mr. Delano Reeves (General Supervisor - Day Labor Division) and in my opinion Mr. Campbell was "strong arming" Mr. Reeves and myself to the point I asked him to stop.  He did not, and continued his assault on the competence and integrity of Mr. Reeves and the entire division leadership, and eventually the conversation became loud and extremely confrontational with Mr. Reeves.  I urged Mr. Campbell to make whatever decisions his authority clearly dictates but for him to continue manipulating the efforts or opinions of subordinates seems completely inappropriate, but he was relentless.

I believe that AOC policies are not consistently enforced and there is absolutely no interest in a cooperative, professional or effective exchange with me or members of my leadership team.

This stressful environment seems to be limited to my operations and at this point I feel the challenges to [sic] great for me to overcome without outside help.  I to believe the environment is effecting me mentally, physically and emotionally, so much so that I've used more Sick Leave during Mr. Campbell's two years on the job than I've used in my previous 33 years combined.

12

71.     Joyce also alerted management that he disagreed with the selection process for candidates and with the implication that his division was not racially diverse.

72.     In October of 2008, Joyce and a colleague determined that no candidate was suitable for an open position.

73.     Campbell subsequently steamrolled the selection process and selected the applicant that Campbell had referred.

74.     In an email to follow-up on Campbell's actions, Joyce wrote, "Mr. Campbell appears to be managing the selection process to ensure his preferred candidates are interviewed selected, and then reserving the right to concur with a process predetermined my [*sic*] himself. (Seems to undermine independent selection without fear of reprisal or individual opinions being expressed)."

**AOC Subjected Joyce To A Public, Humiliating Investigation.**

75.     AOC subjected Joyce to an investigation about possible impropriety with female employees, however, he was provided with no details about the investigation.

76.     On July 1, 2008, Joyce emailed Campbell a "formal complaint" regarding the investigation process in which employees were questioned about Joyce's comings and goings in his office and about possible impropriety with female employees.  Joyce summarized the investigation process as follows:

> After the very first interviews were completed employees reported back the content of the interviews and clearly it became divisional gossip.  One of the custodians interviewed asked to meet with me after discussions with her supervisor and express her concern about the focus of the questioning as it related to gossip about her relationships on the job completely outside the stated objective of the intervention.  She added that most of her interview surrounded an inquiry about me and who comes to my office, is the door

closed, how often do female employees see me and much more. She stated she felt uncomfortable with the questions and how persistent the interviewers perused [*sic*] the topic and added unless required she did not want to participate anymore in the process. When I was interviewed, before even answering questions I advised the panel that their activities were now very public discussion in the division and I had some concerns.  I clearly and deliberately informed them of how I perceived the line of questioning my name and character through gossip and rumors and that I was especially sensitive about management and recognized authorities participating in that conduct.

77.     Management addressed the accusations without identifying the law or standard being violated.   Joyce requested that his "formal complaint" be shared "with any and all parties that need to be notified (to include Architect, IG, Superintendents, EEO, Ombudsman, EAP or others you feel appropriate)."

**AOC Never Allowed Joyce to Redesign His Job Description.**

78.     The AOC often allowed employees and their supervisors to request job audits of their position to allow for a promotion that was previously above the position description.

79.     In approximately 2003 or 2004, on multiple occasions, Joyce's supervisor, Marvin Simpson requested and audit to redesign Joyce's position.

80.     In approximately 2005 or 2006, Joyce himself requested an audit to redesign his position to allow for a promotion to GS -13.

81.     AOC did not permit Joyce an audit to redesign his position to allow for promotion to GS-13 whereas other non-African-American coworkers had their positions redesigned to allow for a GS-13 promotion.

**In March of 2012, Gilles Abruptly and Drastically Changed Joyce's Tour Of Duty Which Led To Joyce's Constructive Termination.**

82.     Joyce took sick leave from March 5, 2012 through March 12, 2012 to recover from a back injury.  Joyce informed his management that he needed to take leave due to this injury.

83.     On Joyce's first day of leave, he called Gilles to confirm his leave.

84.     Joyce's doctor told him to not return to work until his back injury improved.

85.     Against his doctor's orders, Joyce's went to work March 13, 2012 for part of the day to help a co-worker with interviews.  Joyce had previously committed to helping his co-worker and he did not want to break his word.

86.     On that day, when Gilles learned that Joyce was at work, he requested that Joyce come to his office.  Joyce informed Gilles that he had come to the office against his doctor's orders and only intended to stay until interviews were complete.

87.     Gilles insisted that Joyce come to his office, and Joyce obliged.

88.     Gilles issued Joyce a memo dated March 5, 2012, in which Gilles notified Joyce that his "tour of duty" would change in less than a week - on March 19, 2012.

89.     Joyce's new "tour of duty" would drastically change Joyce's shift and his normal working hours.

90.     Instead of working from 4:00 a.m to 12:30 p.m. and managing both the day and night shift, Joyce would work from 8:00 a.m to 4:30 p.m. and manage only the day shift.

91.     This drastic change would make Joyce unable to care for his young grandchildren.

92.     Gilles knew that Joyce required an evening to night schedule in order to care for his grandchildren.

93.     Joyce tried to speak to Gilles to figure out a solution, but Gilles made it clear that his decision was final and that he did not want Joyce's input regarding the decision.

94.     Joyce had witnessed the AOC take similar action toward a former employee who was near retirement.  In April of 2008, AOC changed Custodial Supervisor Alfred Brice's tour of duty and Campbell notified Joyce in an email that Brice had "5 work days to change his schedule."

95.     AOC management gave Joyce no opportunity to find a different position within the AOC.

96.     AOC management claimed that it changed Joyce's shift and schedule and tour of duty because the day shift supervisor was underperforming and AOC wanted Joyce to infuse his leadership on the low performing supervisor.

97.     Joyce had no performance issues as a manager.

98.     Therefore, instead of changing the underperforming day shift supervisor's shift or tour of duty, the AOC decided to retaliate, to discriminate and to change Joyce's schedule drastically.

99.     Due to the drastic and sudden change in his work schedule and an intolerable work environment, Joyce submitted his resignation on or about March 13, 2012.


**Joyce Engaged In Protected Activity.**

100.    On or about March 13, 2012, Joyce was forced to resign, and he submitted his resignation that day.  That same day, Joyce spoke with an Office of Compliance counselor and filed a verbal compliant.

101.    On April 6, 2012, Joyce filed a written complaint with the Office of Compliance.

102.    Prior to his constructive termination, Joyce was asked by both AOC and at least two employees to serve as a witness in Office of Compliance ("OCC") cases.

103.    On April 20, 2012, Joyce's last day in the office, the AOC attorneys called Joyce to their offices and asked him general questions about the Alfreda Hyson ("Hyson"), Roberta Henderson ("Henderson"), and Ana Ceinfuegos ("Cienfuegos") cases.

104.    In the Hyson case, an Assistant United States Attorney issued Joyce a subpoena ordering him to appear at United States District Court for the District of Columbia on June 15, 2012 to testify in the Alfreda Hyson ("Hyson") case.  Joyce testified about his personal knowledge of the interviewing, hiring, and selection for a position to which Hyson applied.

105.    Attorney, Donald MacKay, contacted Joyce for the Henderson and Cienfuegos cases.

106.    Henderson was a day custodial employee who filed an Office of Compliance grievance based on a sexual harassment claim.

107.    Cienfuegos was a day custodial worked and one of Joyce's subordinate employees.  Cienfuegos filed a sexual harassment complaint against the AOC.

108.    On June 14, 2012, Joyce signed a declaration in support of Cienfuegos' case.


**AOC Retaliation Continues Even After Joyce Resigns.**

109.    Joyce negotiated with Christine Merdon and she negotiated with Morey, and both agreed to permit Joyce to resign effective April 30, 2012, but not to return to the office as he had a substantial amount of sick leave accrued.

110.     Gilles agreed to let Joyce "self-certify" his sick leave.

111.    Joyce's attempts to certify as promised were denied.

112.    Joyce submitted three notes in an attempt to self-certify.  After Joyce's first two notes, on April 26, 2012, Gilles notified Joyce that his self-certification did not meet the requirements of AOC Order 630.  Joyce stated that his "back pain still continues" and that his "medical condition has not changed."

113.    Gilles notified Joyce that Joyce would be placed on Absence without Leave ("AWOL") until the AOC received a proper self-certification.

114.    On May 8, 2012, Joyce again wrote that his "medical condition remains back pain."

115.    To date, Joyce is not sure if he has been paid for all his leave from March 13, 2012 through April 30, 2012.

**COUNT I**
**CAA Retaliation**
**Congressional Accountability Act of 1995**
**2 U.S.C § 1317(a)**

116.    Joyce hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

117.    Joyce is an "employee" of the Architect of the Capitol as defined in 2 U.S.C. § 1301(3)(F).

118.    The AOC is an "employing office" as defined in 2 U.S.C. § 1301(9)(D).

119.    The CAA contains an anti-retaliation provision prohibiting intimidation, reprisal, or discrimination against a covered employee because that employee has initiated proceedings or participated in any manner in a proceeding under the CAA.  2 U.S.C. § 1317(a).

120.    The CAA applies to, *inter alia*, any employee of the AOC, 2 U.S.C. § 1301(3).

121.    On April 6, 2012, Joyce filed a written complaint with the Office of Compliance.

18

122.    On April 20, 2012, AOC attorneys requested a meeting with Joyce to discuss his participation in OCC complaints.

123.    Joyce signed a declaration on behalf of an AOC employee and testified in an AOC case.

124.    Joyce was denied sick and leave and was not allowed to self-certify.

125.    Joyce sustained substantial monetary and non-monetary damages as a result of AOC's unlawful conduct.

126.    Joyce exhausted his administrative remedies because he requested counseling for CAA Retaliation and participated in mediation on July 19, 2012.


**COUNT II**
**Age Discrimination**
**Congressional Accountability Act of 1995**
**2 U.S.C § 1317(a)**

127.    Joyce hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

128.    The CAA extends to certain legislative branch employees the protections of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633(a).  *See* 2 U.S.C. § 1311.

129.    Since Joyce became eligible for retirement, management's treatment of him worsened.

130.    After being denied a FWS, one of Joyce's supervisors acknowledged that he might be operating under the assumption that Joyce was using up leave in preparation for retirement.

131.    While eligible for retirement, the AOC drastically changed Joyce's shift and "tour of duty" which affected Joyce's ability to care for his sick and infant family members.

132.   Joyce sustained substantial monetary and non-monetary damages as a result of AOC's unlawful conduct.

133.   Joyce exhausted his administrative remedies because he requested counseling for Age Discrimination and participated in mediation on July 19, 2012.


**COUNT III**
**Race Discrimination**
**Congressional Accountability Act of 1995**
**2 U.S.C § 1317(a)**

134.   Joyce hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

135.   The CAA extends to certain legislative branch employees the protections of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2.  *See* 2 U.S.C. § 1311.

136.   Joyce was never permitted to redesign his position to allow for promotion to GS-13 whereas other coworkers had their positions reevaluated to allow for a GS-13 promotion.

137.   Joyce was managed differently than his Caucasian counterparts.

138.   Joyce sustained substantial monetary and non-monetary damages as a result of AOC's unlawful conduct.

139.   Joyce exhausted his administrative remedies because he requested counseling for Race Discrimination and participated in mediation on July 19, 2012.

## COUNT IV
## FMLA Retaliation
## Congressional Accountability Act of 1995
## 2 U.S.C § 1317(a)

140.    Joyce hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

141.    The CAA extends to certain legislative branch employees the protections of a number of federal remedial statutes, including the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2611–2615.  *See* 2 U.S.C. § 1312.

142.    At all relevant times to this complaint, AOC was an "employer" as defined by the FMLA.

143.    At all relevant times to this complaint, Joyce was an "eligible employee" as defined by the FMLA.

144.    At all relevant times to this complaint, Joyce had a right under FMLA to twelve workweeks of leave during any twelve month period for family and health-related matters.

145.    During the course of his employment, Joyce exercised his rights under the FMLA.

146.    Joyce exercised his rights under the FMLA when he requested and took FMLA protected leave to recover from a back injury in 2012.

147.    Joyce used his FMLA leave in compliance with FMLA regulations, which required AOC to reinstate Joyce upon his return to work.  *See* 29 C.F.R. § 825.124.

148.    At all relevant times to this complaint, AOC had a duty under the FMLA not to retaliate against Joyce for exercising his rights under the FMLA.

149.    At all relevant times to this complaint, AOC had knowledge of the fact that Joyce had taken FMLA protected leave.

150.    Immediately upon Joyce's return to work in 2012 from FMLA protected leave, the AOC retaliated against Joyce by changing his work schedule (his shift), at least in part, because he exercised his rights under the FMLA.

151.    Unless Joyce quit, AOC's retaliation against him would have made Joyce unable to care for his sick and infant family members.

152.    AOC willfully and intentionally changed Joyce's tour of duty because he exercised his rights under the FMLA.

153.    AOC's purported legitimate business reason for its decision to change Joyce's tour of duty is pretext.

154.    Joyce sustained substantial monetary and non-monetary damages as a result of AOC's unlawful conduct.

155.    Joyce exhausted his administrative remedies because he requested counseling for FMLA Retaliation and participated in mediation on October 3, 2012.


**COUNT V**
**FMLA Interference**
**Congressional Accountability Act of 1995**
**2 U.S.C § 1317(a)**

156.    Joyce hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

157.    The CAA extends to certain legislative branch employees the protections of a number of federal remedial statutes, including the Family and Medical Leave Act of 1993 ("FMLA").  *See* 2 U.S.C. § 1312.

158.    At all relevant times to this complaint, AOC was an "employer" as defined by the FMLA.

159.    At all relevant times to this complaint, Joyce was an "eligible employee" as defined by the FMLA

160.    At all relevant times to this complaint, Joyce had a right under FMLA to twelve workweeks of leave during any twelve month period for family and health-related matters.

161.    A back injury qualifies as a "serious health condition" as that term is defined in 29 U.S.C. § 2611(11)(B).

162.    At all relevant times to this complaint, AOC had a duty under the FMLA not to interfere with Joyce's rights under the FMLA.

163.    AOC interfered with Joyce's rights under FMLA when it failed to place Joyce in an equivalent position when he returned from FMLA protected leave.

164.    Joyce sustained substantial monetary and non-monetary damages as a result of AOC's unlawful conduct.

165.    Joyce exhausted his administrative remedies because he requested counseling for FMLA Interference and participated in mediation on October 3, 2012.


**PRAYER FOR RELIEF**

WHEREFORE Joyce prays this Honorable Court for the following relief:

A.    Judgment against the Defendants in the amount of economic damages (including back pay) and compensatory damages to be determined at trial;

B.    Equitable relief including reinstatement, or if reinstatement is not practicable then an award of front pay for future wages;

23

C.      Reasonable attorneys' fees and the costs of this action, pre-judgment interest; and

D.      Any other relief this Honorable Court deems just and proper to award.


**JURY DEMAND**

Joyce demands a trial by jury for any and all issues proper to be so tried.



Respectfully submitted,



_____/s/ Adam Augustine Carter_____
Adam Augustine Carter, 437381
R. Scott Oswald, 458859
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com
*Counsel for Plaintiff*