## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ARTHUR RICHARD JOYCE,**

     **Plaintiff,**

       **v.**                                **Civil Action No. 12-1837 (JEB)**

**OFFICE OF THE ARCHITECT OF THE
CAPITOL,**

     **Defendant.**

### MEMORANDUM OPINION

Upon returning from a week of medical leave, Plaintiff Frank Joyce was told that his work schedule with the Architect of the Capitol would be changing for the first time in twelve years. His new shift, moreover, would leave him unable to continue as his grandchildren's primary caregiver. Instead of accepting the new schedule, Joyce resigned. In this suit under the Congressional Accountability Act, Joyce asserts that his shift change (and attendant forced resignation) was discriminatory. Specifically, he claims that the change was motivated by retaliation for past protected activity, age discrimination, and retaliation for taking protected medical leave, and he further alleges that the change illegally interfered with his right to take medical leave. The AOC now moves to dismiss. Concluding that the allegations supporting the first retaliation count fall short, but that those supporting the other claims clear the pleading bar, the Court will grant the AOC's Motion in part and deny it in part.

## I.      Background

Because the Motion at issue is a motion to dismiss, the Court draws the facts from the Amended Complaint, assuming them to be true at this stage.

A.  Factual Background

The Architect of the Capitol is a legislative-branch office that repairs and maintains the

U.S. Capitol and its associated facilities.  See 2 U.S.C. §§ 1811-1827.  Frank Joyce worked at the

AOC for 39 years.  See Am. Compl., ¶ 14.  Since 2000, Joyce had been the Facilities Supervisor

for the Labor and Custodial Branch of the Client Services Division at the AOC Senate Office

Buildings, overseeing 250 employees.  See id., ¶¶ 15, 18.  For his entire tenure as Facilities

Supervisor, Joyce straddled the night and day shifts, working from 4:00 a.m. to 12:30 p.m. (or,

when working a flexible schedule, 1:30 p.m.).  See id., ¶ 17.  He came to rely on this schedule

after his daughter gave birth to twins in 2010.  See id., ¶¶ 24-25.  In the afternoon, while his

daughter worked, Joyce would act as primary caregiver for his grandchildren.  See id., ¶¶ 7, 25,

88.

Six years into his time as Facilities Supervisor, Joyce began to clash with management

over his requests for family and medical leave.  In 2006 and 2009, for example, Joyce needed

leave to care for his wife after her leg surgery (2006) and dizzy spells requiring her

hospitalization (2009).  See id., ¶¶ 21, 23.  In 2010, Joyce again required leave, this time to care

for his daughter during her difficult pregnancy.  See id., ¶ 24.  Management repeatedly denied

Joyce's requests for leave outright or – despite a process allowing employees to "self-certify"

leave without a doctor's note, see id., ¶ 33 – refused to give him more than 24 hours of leave

without documentation.  See generally id., ¶¶ 27-47, 52.

These squabbles over leave eventually spilled over to other personnel matters.  In 2011,

Joyce's request for a flexible work schedule was denied because, "'[b]ased on [his] leave record,

[he] ha[d] not established a pattern of regular work attendance.'"  Id., ¶¶ 49, 51.  When Joyce

confronted management, his supervisor's supervisor admitted that the denial "might" be

attributable to a "mistaken belief that Joyce was using his leave in preparation for retirement." Id., ¶¶ 54-55.  (It appears Joyce was eventually allowed a flexible schedule.  See id., ¶ 17.) Joyce also details other grievances about his work environment, but as they are untethered from discrimination, see id., ¶¶ 56-77, the Court need not recount them.

Problems came to a head when Joyce injured his back in March 2012.  His doctor said not to return to work until the injury improved.  See id., ¶ 80.  Joyce therefore took sick leave from March 5 to March 12, informing management beforehand and calling his supervisor on March 5 to confirm his leave.  See id., ¶¶ 78-79.  When Joyce returned to work on March 13, his supervisor handed him a memo (dated March 5) assigning Joyce a new schedule: beginning March 19, Joyce would work the day shift from 8:00 a.m. to 4:30 p.m. instead of his usual shift from 4:00 a.m. to 12:30 p.m.  See id., ¶¶ 81, 84, 86.  As his supervisor knew, the new schedule would leave Joyce unable to care for his grandchildren.  See id., ¶¶ 87-88.  AOC management claimed that the change was made "because the day shift supervisor was underperforming and AOC wanted Joyce to infuse his leadership on the low performing supervisor."  Id., ¶ 92.  Joyce, however, believes it was motivated by discrimination.  See id., ¶ 94.  Despite Joyce's protests, his supervisor refused to revisit the decision.  See id., ¶ 89.  Joyce then submitted his resignation. See id., ¶¶ 95-96.

Though the resignation would not take effect until April 30, Joyce was at home for much of his remaining time on account of his back injury.  See id., ¶¶ 105, 111.  Management had told Joyce that he could self-certify some of this sick leave, but his repeated attempts to do so were denied.  See id., ¶¶ 106-10.  "To date, Joyce is not sure if he has been paid for all his leave from March 13, 2012 through April 30, 2012."  Id., ¶ 111.

In the days and weeks after March 13, Joyce played a role in at least four discrimination cases against the AOC.  Even before his resignation, Joyce had been asked by both the AOC and by AOC employees to serve as a witness in other cases.  See id., ¶ 98.  On April 20, AOC attorneys spoke with Joyce about three discrimination cases involving other employees.  See id., ¶ 99.  The AOC eventually subpoenaed Joyce in one lawsuit, and he testified on June 15.  See id., ¶ 100.  He gave a declaration in support of another employee on June 14.  See id., ¶ 104.  Joyce also pursued his own case, making a verbal complaint with the AOC Office of Compliance on the day of his resignation, then filing a written complaint on April 6.  See id., ¶¶ 96-97.  To exhaust administrative remedies, he participated in counseling and mediation with the AOC in July and October.  See id., ¶¶ 122, 129, 145, 155.

   B.  Procedural Background

Joyce brought this suit against the AOC on November 13, 2012, asserting five counts under the Congressional Accountability Act.  He amended his Complaint on January 4, 2013, dropping the count for race discrimination.  The AOC now moves to dismiss.

The AOC also moves, in the alternative, for summary judgment.  Because of the parties' confusion about that aspect of the Motion, however, the Court does not reach the summary-judgment issues.  The AOC moved for summary judgment in part because of purported defects in claims that Joyce did not actually bring in his Amended Complaint (such as for racial discrimination and hostile work environment) and in part because Joyce had insufficient evidence to rebut the AOC's nondiscriminatory explanations for its actions.  See Mot. at 22 (citing Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)).  The latter ground for summary judgment is clearly premature:  When filing his complaint, a discrimination plaintiff rarely has proof that his employer's explanation is pretextual.  Instead, he hopes that

4

discovery will uncover evidence to support his allegations.  See, e.g., Blue v. Jackson, 860 F.

Supp. 2d 67, 78 (D.D.C. 2012).  To postpone a premature motion for summary judgment,

however, a plaintiff generally must file an affidavit or declaration under Federal Rule of Civil

Procedure 56(d) explaining why he needs discovery to oppose the motion.

 In this case, Joyce believed that the AOC agreed that no affidavit was necessary, and thus

he never filed one.  See Opp. at 1 n.1.  The confusion stems from an e-mail exchange between

the parties' counsel.  After ascertaining that Joyce was not suing for a hostile work environment

or racial discrimination, the AOC's attorney agreed that Joyce need not address those arguments

in his Opposition.  See Opp., Exh. 1 (E-mail Between Counsel (May 28, 2013)).  Joyce's

attorney replied that he would tell the Court that "there is now no need to oppose the motion for

summary judgment or to file a Rule 56(d) affidavit with this understanding between us," and the

AOC's attorney responded, "Thank you."  Id. (emphasis added).  Obviously, counsel were

talking past each other.  In light of this confusion and the fact that the Court would have granted

a Rule 56(d) request, the Court will consider only the AOC's Motion to Dismiss.  In future

arrangements, however, the Court trusts that counsel will be more careful to ensure that they are

on the same page.

## II. Legal Standard

 Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief

when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a

motion to dismiss, the Court must "treat the complaint's factual allegations as true and must

grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow

v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation

marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as

true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation omitted).  Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as copies of written instruments joined as exhibits.  See Fed. R. Civ. P. 10(c).  Where the Court must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

## III.    Analysis

Joyce brings four counts under the Congressional Accountability Act of 1995, 2 U.S.C. § 1301 *et seq.*, alleging retaliation (Count I), age discrimination (Count II), retaliation for taking family and medical leave (Count IV), and interference with family and medical leave (Count V).  (A misnumbering of counts resulted in no Count III in the Amended Complaint.)  After giving an overview of the law that frames each count, the Court will consider the AOC's primary

objection: that Joyce never suffered an adverse employment action.  The Court will then deal with the hodgepodge of claim-specific challenges that the AOC raises.

    A.  <u>Statutory Framework</u>

    Most federal antidiscrimination statutes exempt Congress from their coverage.  <u>See, e.g.</u>, 42 U.S.C. § 2000e-16(a) (extending Title VII of Civil Rights Act of 1964 to federal judicial and executive employees, but not legislative ones).  Instead, legislative-branch employees, including AOC employees, must bring discrimination claims under the Congressional Accountability Act.  The Act has its own elaborate set of procedural requirements.  For example, a covered employee claiming discrimination must seek counseling within 180 days, then engage in at least 30 days of mediation with her employing office.  <u>See</u> 2 U.S.C. §§ 1402-1403.  Only after completing those alternative-dispute-resolution processes may she bring suit.  <u>See</u> 2 U.S.C. § 1408(a); <u>see also</u> <u>Blackmon-Malloy v. U.S. Capitol Police Bd.</u>, 575 F.3d 699, 705-06 (D.C. Cir. 2009) (counseling and mediation requirements are jurisdictional).

    In substance, however, the Congressional Accountability Act expressly incorporates protections and remedies from the generally applicable federal antidiscrimination statutes.  <u>See</u> 2 U.S.C. § 1302.  Claims relating to age discrimination and to family and medical leave thus track their federal analogs.  <u>See</u> 2 U.S.C. § 1311(a)(2) (incorporating parts of Age Discrimination in Employment Act of 1967); 2 U.S.C. § 1312 (incorporating parts of Family and Medical Leave Act of 1993).  Though retaliation under the CAA has no explicit tie to other statutes, <u>see</u> 2 U.S.C. § 1317, both parties agree – following D.C. Circuit <i>dicta</i> and district court holdings – that the framework for Title VII retaliation applies.  <u>See</u> Mot. at 23-24; Opp. at 12-13; <u>see also</u> <u>Fields v. Office of Eddie Bernice Johnson</u>, 459 F.3d 1, 15 n.24 (D.C. Cir. 2006); <u>Newton v. Office of Architect of Capitol</u>, 905 F. Supp. 2d 88, 92-93 (D.D.C. 2012); <u>Hollabaugh v. Office of</u>

*Architect of Capitol*, 847 F. Supp. 2d 57, 66 (D.D.C. 2012).  The substantive law for Joyce's claims therefore comes from Title VII, the ADEA, and the FMLA.

While the requirements for proving a *prima facie* case of discrimination should not be made into a heightened pleading standard, see *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), in this case the elements of each count act as a useful guide to understanding the AOC's objections.

Count I alleges retaliation for engaging in protected activity – specifically, that the AOC denied Joyce sick leave and self-certification because he participated in and brought discrimination cases against the AOC.  See Am. Compl., ¶¶ 112-22.  "To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by [the statute]; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice."  *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012).

Count II alleges age discrimination.  According to Joyce, the AOC changed his schedule – forcing him to resign – because they assumed he would retire soon.  See Am. Compl., ¶¶ 123-29.  To establish a *prima facie* case under the ADEA, a plaintiff must show that "(1) she is a member of a protected class" (*i.e.*, at least 40 years of age); "(2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (citation omitted).

Count IV alleges retaliation for taking family and medical leave.  Joyce claims that the AOC switched his shift (and thus forced him to resign) in retaliation for protected medical leave he took immediately before the switch.  See Am. Compl., ¶¶ 130-45.  Retaliation occurs under the FMLA when an employer "discharge[s] or in any other manner discriminate[s] against any

individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2);

see also Shaffer v. Am. Med. Ass'n, 662 F.3d 439, 443 (7th Cir. 2011).  As in Title VII, to prove

FMLA retaliation, a plaintiff must show that (1) he engaged in a protected activity under this

statute; (2) his employer took a materially adverse action against him; and (3) the employer took

the action because of his protected activity.  See McFadden v. Ballard Spahr Andrews &

Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010) (frameworks for FMLA retaliation and Title VII

retaliation are "essentially the same"); see also Gleklen v. Democratic Cong. Campaign Comm.,

Inc., 199 F.3d 1365, 1367-68 (D.C. Cir. 2000).

Last, Count V alleges interference with family and medical leave.  The AOC interfered,

according to the Amended Complaint, by refusing to restore Joyce to an equivalent job when he

returned from medical leave.  See Am. Compl., ¶¶ 146-55.  The FMLA makes it "unlawful for

any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any

right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  One such protected "right" is,

upon returning from protected leave, "(A) to be restored by the employer to the position of

employment held by the employee when the leave commenced; or (B) to be restored to an

equivalent position with equivalent employment benefits, pay, and other terms and conditions of

employment." 29 U.S.C. § 2614(a)(1).  In other circuits, "[t]o prevail on an FMLA-interference

theory, the plaintiff employee must prove that: (1) she was eligible for the FMLA's protections;

(2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA;

(4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her

FMLA benefits to which she was entitled." Pagel v. TIN Inc., 695 F.3d 622, 627 (7th Cir. 2012)

(internal quotation marks omitted); see also Hodges v. District of Columbia, No. 12-1675, 2013

WL 4047197, at *6 (D.D.C. Aug. 12, 2013) ("To state an FMLA interference claim, a plaintiff

must allege facts sufficient to show, among other things, that (1) he was entitled to take leave because he had a 'serious health condition,' (2) he gave his employer adequate notice of his intention to take leave, and (3) his employer denied or otherwise interfered with his right to take leave.") (citation omitted).

With the law now laid out, the Court can proceed to the AOC's challenges.

B. <u>Adverse Action</u>

Counts I, II, and IV demand adverse actions.  An adverse action in a <u>non</u>-retaliation claim like Count II (age discrimination) requires a "tangible employment action," meaning "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998).  Retaliation claims like Counts I (CAA) and IV (FMLA) require less, barring any act that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67-68 (2006) (citation and internal quotation marks omitted).  The distinction, however, does not prove dispositive for this Motion.

Joyce sees three "adverse actions" here: denials of his requests for sick leave and his attempts to self-certify (for Count I); his shift change (for Counts II and IV); and his constructive discharge (for Counts II and IV as well).  <u>See</u> Am. Compl., ¶¶ 120, 127, 140-42.  Only the constructive discharge survives as a possible adverse action here, however.

1. *Sick Leave and Self-Certification*

Denial of self-certification for sick leave is too trivial to support a retaliation claim. Courts in this District have rejected arguments that similar procedural or administrative

requirements placed on leave requests constitute adverse actions.  See Douglas-Slade v. LaHood, 793 F. Supp. 2d 82, 98 (D.D.C. 2011) (restriction requiring plaintiff to request leave in advance did not constitute adverse action in retaliation case); Hutchinson v. Holder, 668 F. Supp. 2d 201, 217-18 (D.D.C. 2009) (requirement that plaintiff communicate sick-leave requests directly to supervisor instead of via normal procedure of communicating such requests to co-worker did not constitute adverse action in discrimination case); see also Maxwell–Perkins v. Principi, No. 02-2878, 2003 WL 21148556, at *9 (N.D. Ill. May 19, 2003) (placement on sick-leave restriction, which "merely required Plaintiff to comply with an additional procedural requirement and did not materially alter her terms or conditions of employment," not adverse employment action in retaliation claim).  At the end of the day, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  White, 548 U.S. at 68.

On the other hand, a denial of sick leave itself would probably qualify because it is likely to dissuade a reasonable worker from making a charge of discrimination.  See Diggs v. Potter, 700 F. Supp. 2d 20, 43 (D.D.C. 2010) (denial of request for sick leave "may well constitute an adverse or materially adverse action").  The Court need not resolve that issue, however, because Joyce has not pled that an actual denial occurred.  His Amended Complaint says, "To date, Joyce is not sure if he has been paid for all his leave from March 13, 2012 through April 30, 2012." Am. Compl., ¶ 111.  In other words, he has not alleged – even based on information and belief – that his leave was unpaid.  That omission proves fatal.  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  White, 548 U.S. at 67.  With no material injury alleged, Count I must be dismissed.

2. *Shift Change*

The shift-change allegations run into a different problem. Even if a shift change may constitute an adverse action, Joyce's shift never actually changed. Instead, the Amended Complaint indicates that he rejected the new schedule and resigned. See Am. Compl., ¶¶ 95-96. As he never worked on the new shift, he cannot complain that this constitutes an adverse action. See Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("courts have been unwilling to find adverse actions where the suspension is not actually served"); see also Hinson v. Clinch Cnty. Bd. of Educ., 231 F.3d 821, 829 & n.10 (11th Cir. 2000) (noting in *dicta* that a "proposed uneffectuated transfer is not an adverse employment action"). The shift change thus cannot sustain Counts II and IV.

The Court need not dwell on whether such a rule might unfairly penalize Plaintiff or encourage other employees to stay in a new shift for a day before resigning in order to preserve an adverse-action claim. This is because Plaintiff still has his constructive-discharge claim, which is based entirely on the shift change. If he can prove the shift change constituted a constructive discharge, then he will stand in the same shoes as he would have had he worked briefly in the new shift before quitting.

3. *Constructive Discharge*

Joyce's resignation, therefore, remains as the sole basis for Plaintiff's Counts II and IV. If he can prove that his quitting was not voluntary but was instead a "constructive discharge," then the resignation constitutes an adverse employment action attributable to the AOC: "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in

the employee's position would have felt compelled to resign?"  Pa. State Police v. Suders, 542

U.S. 129, 141 (2004) (citation omitted); see also Aliotta v. Bair, 614 F.3d 556, 566 (D.C. Cir.

2010) ("The test for constructive discharge is an objective one: whether a reasonable person in

the employee's position would have felt compelled to resign under the circumstances.").  Though

most often alleged in hostile-work-environment cases, almost any type of discrimination can

trigger a constructive discharge.  See Suders, 542 U.S. at 142 (collecting cases).  Finally, because

the retaliation claim in Count IV does not even require a tangible employment action, see Section

III.B, *supra*, if Plaintiff prevails on constructive discharge, he easily survives a motion to dismiss

that count.

"[T]he requirement that conditions be 'intolerable' to support a constructive discharge

will not easily be met."  Simpson v. Fed. Mine Safety & Health Review Comm'n, 842 F.2d 453,

463 (D.C. Cir. 1988) (R. Ginsburg, J.) (applying Title VII standards).  Because "society and the

policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is

attacked within the context of existing employment relationships," employees are generally

expected to stay at their jobs instead of resigning.  Clark v. Marsh, 665 F.2d 1168, 1173 (D.C.

Cir. 1981) (citation and internal quotation marks omitted); see also Suders, 542 U.S. at 147

(citing Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997)); Hopkins v. Price

Waterhouse, 825 F.2d 458, 473 (D.C. Cir. 1987), rev'd on other grounds, 490 U.S. 228 (1989).

Before applying the constructive-discharge test to the facts here, a few points about the

test bear emphasis.  First, despite stray references to the employer's "deliberately" driving the

employee to resign, see Clark, 665 F.2d at 1173, in fact the employer's intent as to resignation is

irrelevant.  See Simpson, 842 F.2d at 461-63; Hopkins, 825 F.2d at 472; Clark, 665 F.2d at 1175

n.8.  Similarly, because the test is objective, an employee's "unusual subjective feelings" cannot

give rise to a constructive discharge.  See White, 548 U.S. at 69.

Second, the test takes into account all of the objective circumstances of the situation,

including circumstances outside the office – such as being a primary caregiver for grandchildren

at a particular time of day.  The Supreme Court has explained why in applying an analogous

"reasonable worker" test for retaliation:

> Context matters.  The real social impact of workplace behavior
> often depends on a constellation of surrounding circumstances,
> expectations, and relationships which are not fully captured by a
> simple recitation of the words used or the physical acts performed.
> A schedule change in an employee's work schedule may make
> little difference to many workers, but may matter enormously to a
> young mother with school-age children.  Cf., *e.g.*, Washington [v.
> Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)] (finding
> flex-time schedule critical to employee with disabled child). . . .
> Hence, a legal standard that speaks in general terms rather than
> specific prohibited acts is preferable, for an "act that would be
> immaterial in some situations is material in others." Washington,
> *supra*, at 661.

Id. at 69 (citation and internal quotation marks omitted).

Third and finally, the "intolerableness of working conditions is very much a function of

the reasonable expectations of the employee."  Hopkins, 825 F.2d at 472.  An employee who

expected genuine opportunities for advancement, for example, may reasonably feel compelled to

quit when discrimination has closed those doors.  See, e.g., id. at 472-73; Clark, 665 F.2d at

1174-76; cf. Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1558 (D.C. Cir. 1997)

(employee who cannot reasonably expect continued employment is not constructively discharged

when offered less desirable position).  A cross-country transfer away from family, on the other

hand, is not a constructive discharge when the employee knew the risk of such transfers.  See

Poland v. Chertoff, 494 F.3d 1174, 1185-86 (9th Cir. 2007).  Before resigning, moreover, an

employee should generally ask his employer to remedy the objectionable working conditions.
See, e.g., DeWalt v. Meredith Corp., 288 Fed. App'x 484, 495 (10th Cir. 2008) (unpublished).

In claiming a constructive discharge in this case, Joyce relies primarily – but not
exclusively – on his anticipated shift change.  Before deciding whether that shift change can
support a constructive discharge, the Court must deal with two threshold matters.

First, the AOC claims that the other events Joyce relies on, dating back to 2006, are
barred by the statute of limitations.  See 2 U.S.C. § 1402(a) (employee must request counseling
within 180 days of "alleged violation").  Joyce admits that a stand-alone suit about those
employment actions would be "time-barred."  See Opp. at 10.  He correctly notes, however, that
the events provide context for deciding if the working conditions were intolerable.  Whether a
reasonable employee would resign depends on all of the circumstances, including the employee's
history with the employer – indeed, it often takes repeated conduct to drive an employee to quit.
See, e.g., Clark, 665 F.2d at 1174 (employee repeatedly denied promotions over 11 years).  So
while the older events alone could not sustain a suit, they can inform whether a reasonable
person in Joyce's position would have felt compelled to resign.

Second, the AOC argues that Joyce has forfeited his accusation of constructive discharge
by failing to sufficiently raise it in his Complaint.  See Reply at 2-3, 10, 19.  That argument is
baseless.  At least five times, the Amended Complaint alleges that he was constructively
terminated.  See Am. Compl., ¶¶ 1, 7, 13 (title), 78 (title), 98.  Perhaps the AOC meant to say
that Joyce has not sufficiently pled a common-law claim for constructive discharge.  Indeed he
has not, but this is because Joyce sues for discrimination, not common-law constructive
discharge.

Moving now to the merits, the Court begins with D.C. Circuit precedent that a shift change that materially alters the conditions or privileges of employment may be an adverse action.  See Freedman v. MCI Telecomms. Corp., 255 F.3d 840, 844 (D.C. Cir. 2001) (transfer to night shift an adverse employment action because it interfered with plaintiff's education).  While Freedman concerned education, other circuits have been somewhat less indulgent in applying the constructive-discharge test to schedule changes that relate to family care.  See, e.g., Grube v. Lau Indus., Inc., 257 F.3d 723, 726, 728-29 (7th Cir. 2001) (no constructive discharge when, after 20 years of working one shift, transfer to second shift made employee unable to care for her husband with leukemia); DeWalt, 288 Fed. App'x at 486, 494-95 (no constructive discharge when, after 15 years of working day shift, transfer to night shift caused employee "significant problems for his health and his family"); but see Alvarado v. Fed. Express Corp., 384 Fed. App'x 585, 589 (9th Cir. 2010) (unpublished) (upholding finding of constructive discharge when employee's shift was changed to "a time she could no longer make," without specifying her conflict).

That inconsistency reflects the tension underlying judicial review of schedule changes. On the one hand, an employer that must fill multiple shifts each day "would be in a most precarious position" if a routine scheduling decision could justify a resignation.  Grube, 257 F.3d at 728.  On the other, an employee may build her life around working at a particular time.  Many lawyers might quit, one imagines, if suddenly made to work the night shift since "conditions that are conventional for a stevedore may be intolerable for a lawyer, and perhaps vice versa." Taylor v. FDIC, 132 F.3d 753, 766 (D.C. Cir. 1997).

Bearing all this in mind, the Court concludes that Joyce has alleged enough to make a colorable argument that his resignation here was a constructive discharge.  In close cases, the

Court must recall that "[w]hether conditions are so intolerable that a reasonable person would feel compelled to resign is a question for the trier of fact." <u>Simpson</u>, 842 F.2d at 463.  Drawing all reasonable inferences in Joyce's favor, the Court cannot say as a matter of law that a reasonable employee would find a shift change tolerable when the change leaves him unable to continue as his grandchildren's primary caregiver.  In other words, acting as a primary caregiver can – in some circumstances – function as the kind of objective, unusual circumstance that makes a change in shifts rise to a constructive discharge.  <u>See</u> <u>Washington</u>, 420 F.3d at 662 (plaintiff could maintain retaliation suit based on shift changes given that defendant knew plaintiff's son had medical condition so that a 9-to-5 schedule "was a materially adverse change <u>for her</u>, even though it would not have been for 99% of the staff").

No allegations here, moreover, suggest that Joyce should have anticipated the risk of such a change.  <u>Cf.</u> <u>Poland</u>, 494 F.3d at 1185-86.  Indeed, according to the Amended Complaint, he had worked the same shift since 2000.  <u>See</u> Am. Compl., ¶ 17.  Nor is there reason to think Joyce quit prematurely.  <u>Cf.</u> <u>DeWalt</u>, 288 Fed. App'x at 495 (employee quit without requesting transfer back to preferred shift).  He alleges that his supervisor rebuffed his bid to have the decision reconsidered.  <u>See</u> Am. Compl., ¶ 89.

This ruling notwithstanding, a variety of facts could come to light during discovery to suggest that Joyce's resignation was unreasonable.  For example, perhaps the AOC routinely moves around the schedules of facilities supervisors, or Joyce's contract warned of such a possibility.  Or maybe Joyce's role as primary caregiver is overblown; if he has other options for care for his grandchildren, resignation may have been an unreasonable response dictated by subjective preferences instead of objective circumstances.  <u>See</u> <u>Washington</u>, 420 F.3d at 662-63.  And of course the suit will succeed only if Joyce can rebut the AOC's stated rationale for the

shift change and show that it was in fact the product of discrimination.  At the motion-to-dismiss stage, however, Joyce may build his suit on constructive discharge.

 C. Claim-Specific Objections

 Beyond its challenge to the existence of an adverse action, the AOC raises at least one challenge specific to each remaining count.  As Count I has been dismissed, the Court will address Defendant's arguments as to Counts II, IV, and V.

  1. *Age Discrimination (Count II)*

 On the age-discrimination claim, the AOC points out that Joyce never alleged that he falls within the class protected by the ADEA – namely, that he is at least 40 years old.  See 29 U.S.C. § 631(a).  His Amended Complaint does allege, however, that he "began his employment with the AOC in 1973."  Am. Compl., ¶ 13.  Unless the AOC uses toddler labor, Joyce is older than 40.  Drawing all reasonable inferences in Joyce's favor, the Court can safely say he is protected by the ADEA.

  2. *FMLA (Counts IV and V)*

 Before raising grievances specific to each FMLA count, the AOC argues generally that Joyce cannot bring any FMLA claim because he failed to properly request FMLA leave.  The parties go back and forth on how specific a request must be for the FMLA to kick in, bickering over whether Joyce "provide[d] at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. § 825.302(c) (foreseeable leave); see also id. § 825.303 (notice for unforeseeable leave).  Fortunately, the Court need not wade into the factual details.  The Amended Complaint repeatedly alleges that Joyce took leave under the FMLA, see Am. Compl., ¶¶ 6, 136, 139-40, 153, explaining that he told management he would be taking leave, then

confirmed that leave with his supervisor.  See id., ¶¶ 78-79.  At the pleading stage, Joyce need

not allege the minutiae of what he said to whom and when.  See Fed. R. Civ. P. 8(a)(2) (pleading

must contain "a short and plain statement of the claim showing that the pleader is entitled to

relief").

 The AOC also argues that Joyce's injury was ineligible for FMLA leave.  Treating his

allegations as true, however, Joyce's back injury qualified as a "serious health condition" that

left him unable to perform the functions of his position, see 29 U.S.C. § 2612(a)(1)(D) – indeed,

his doctor told him to stay home until it improved.  See Am. Compl., ¶ 80.  Should discovery

reveal that Joyce's injury was trifling or his notice of leave fell short, the AOC can renew its

arguments in a motion for summary judgment.

 On FMLA retaliation (Count IV), the AOC argues that Joyce cannot cry retaliation when

he never "oppose[ed] any practice made unlawful" by the FMLA.  See 29 U.S.C. § 2615(a)(2)

(FMLA retaliation: "It shall be unlawful for any employer to discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful by this

subchapter.").  All Joyce did was take protected leave.  That textual argument appears

compelling.  "Opposing" an unlawful practice normally means objecting when the employer

breaks the law, not exercising the underlying right.  Courts nonetheless often count penalizing

protected leave as FMLA retaliation.  See, e.g., Breeden v. Novartis Pharm. Corp., 646 F.3d 43,

49 (D.C. Cir. 2011); Gleklen, 199 F.3d at 1368 & n.3; James v. Hyatt Regency Chi., 707 F.3d

775, 781 (7th Cir. 2013); Millea v. Metro-N. R.R. Co., 658 F.3d 154, 164 (2d Cir. 2011).  At this

stage, however, the Court need not agonize over the label.  Whether called "retaliation" or

something else, the FMLA clearly prohibits adverse actions motivated by FMLA-protected

leave.  See Quinn v. St. Louis County, 653 F.3d 745, 754 n.7 (8th Cir. 2011) (claim should be

brought under § 2615(a)(1)); <u>Erdman v. Nationwide Ins. Co.</u>, 582 F.3d 500, 508 (3d Cir. 2009)

(claim should be brought under 29 C.F.R. § 825.220(c)).  While the elements of the *prima facie*

case may depend on the precise statutory or regulatory basis for liability, the allegations in the

Amended Complaint are sufficient under any theory, and thus Count IV survives.

On FMLA interference (Count V), the AOC challenges both FMLA "right[s]" that Joyce

claims were "interfere[d]" with.  <u>See</u> 29 U.S.C. § 2615(a)(1) (FMLA interference: "It shall be

unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under this subchapter.").  First, although not mentioned in his

allegations relating to Count V, <u>see</u> Am. Compl., ¶¶ 146-55, Joyce argues that one basis for

finding FMLA interference is the AOC's denial of FMLA leave in early 2011.  <u>See</u> Opp. at 18.

Such a claim is time barred.  For this Court to have jurisdiction, an employee must request

counseling "not later than 180 days after the date of the alleged violation."  2 U.S.C. § 1402(a);

<u>see</u> <u>id.</u> § 1408(a).  But Joyce mentions no counseling until after March 2012.  <u>See</u> Am. Compl.,

¶ 155.  If he wanted to challenge the 2011 denial of leave, he should have acted sooner.

Second, Joyce alleges that the AOC interfered when it failed to place him in an

equivalent position when he returned from FMLA-protected leave.  <u>See</u> Am. Compl., ¶ 153.  The

AOC argues that, in the same way an unfulfilled threat of a shift change cannot constitute an

adverse action, <u>see</u> Section III.B.2, *supra*, the fact that Joyce rejected the new hours forecloses a

charge of FMLA interference.  That argument, however, ignores the statutory "right" that the

AOC allegedly "interfered with" here:

> [A]ny eligible employee who takes leave under section 2612 of
> this title for the intended purpose of the leave shall be entitled, on
> return from such leave –
>     (A) to be restored by the employer to the position of
>     employment held by the employee when the leave
>     commenced; or

> (B) to be restored to an equivalent position with
> equivalent employment benefits, pay, and other terms and
> conditions of employment.

29 U.S.C. § 2614(a)(1).  Unlike the negative right given by most discrimination statutes (*i.e.*,

<u>against</u> adverse actions), Section 2614 bestows a positive right to return to a job with "equivalent

. . . terms and conditions of employment" – a right Joyce claims was violated here by the new

hours.  So it is irrelevant that Joyce quit instead of accepting the shift change.  Presumably the

AOC could avoid liability by showing that Joyce's shift would have changed regardless of

whether he took leave.  <u>See</u> <u>Goelzer v. Sheboygan County</u>, 604 F.3d 987, 993 (7th Cir. 2010).

At this stage, however, Joyce has stated a case for FMLA interference because he was never

given the option of returning to an equivalent position.  As the AOC allegedly failed to restore

Joyce to an equivalent position, Count V survives.

**IV.**     **Conclusion**

For the aforementioned reasons, the Court will grant in part and deny in part Defendant's

Motion to Dismiss or, in the Alternative, for Summary Judgment.  Count I alone will be

dismissed.  A separate Order consistent with this Opinion will be issued this day.

<u>/s/ James E. Boasberg</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>September 5, 2013</u>