**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ARTHUR RICHARD JOYCE,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 12-1837 (JEB) |
| **OFFICE OF THE ARCHITECT OF THE CAPITOL,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Plaintiff Arthur Richard Joyce worked for the Office of the Architect of the Capitol for thirty-nine years. From 2000 to 2012, he served as a Facilities Supervisor, in which capacity he worked from 4:00 a.m. to 12:30 p.m. and oversaw both the day and night shifts. In March 2012, claiming it needed to beef up supervision of the day staff, the AOC shifted his hours somewhat later in the day. As this move left him unable to care for his young grandchildren, Joyce resigned and asserted constructive discharge. In this suit under the Congressional Accountability Act, Plaintiff alleges that his shift change (and attendant forced resignation) was discriminatory. Specifically, he claims that the change was motivated by age discrimination, constituted retaliation for taking protected medical leave, and illegally interfered with his right to take such leave. The AOC now moves for summary judgment. Concluding that no reasonable jury could find for Joyce on any of his counts, the Court will grant the Motion.

I. **Background**

In this section, the Court sets forth the facts in the light most favorable to Plaintiff, the non-moving party. The Office of the Architect of the Capitol is a legislative-branch office that

repairs and maintains the U.S. Capitol and its associated facilities.  <u>See</u> 2 U.S.C. §§ 1811-1827.

Rick Joyce worked at the AOC for thirty-nine years.  <u>See</u> Def.'s Statement of Facts, ¶ 2.  In

2000, he was promoted to the position of Facilities Supervisor for the Labor and Custodial

Branch of the Client Services Division at the AOC Senate Office Buildings.  <u>See</u> Pl.'s Record of

Facts (PROF), ¶ KK.  As Facilities Supervisor, Plaintiff straddled the night and day shifts,

working from 4:00 a.m. to 12:30 p.m. – or occasionally from 3:30 a.m. to 1:00 p.m.  <u>Id.</u>, ¶ D.

Joyce came to rely on these hours.  <u>Id.</u>, ¶¶ MM-OO.  He had four toddler grandchildren at the

time whom he routinely cared for, picking them up from daycare after his shift or earlier when

they were sick.  <u>Id.</u>

        While it appears that things began to sour as early as 2006, the first dispute relevant to

this action occurred in 2011.  At that time, Jean Gilles – Joyce's first-level supervisor – denied

his application for a flexible work schedule.  <u>Id.</u>, ¶ TT.  In Gilles's judgment, Plaintiff had not

"established a pattern of regular work attendance" at the time, and his "leave balance was low

considering . . . the amount of time [he had] been employed . . . ."  <u>Id.</u>  Plaintiff responded to this

denial by approaching AOC Superintendent Robin Morey (Joyce's third-level supervisor).  <u>Id.</u>,

¶¶ UU, VV.  In the conversation that followed, Joyce suggested to Morey "that he and leadership

obviously were operating under the mistaken belief that [Joyce] was using up [his] leave in

preparation for retirement."  <u>See</u> Opp., Exh. 24 (June 29, 2011, Formal Grievance of Arthur

Joyce).  According to Joyce, Morey indicated in response that "that 'might' be the perception but

the denial was based on total hours used."  <u>Id.</u>

        In February 2012, the AOC received a complaint that an area in the Senate Rotunda was

dirty and had not been recently cleaned.  <u>See</u> PROF, ¶ M.  In a meeting that followed, Delano

Reeves – Joyce's direct report on the day shift – refused to take responsibility for the failure.  <u>Id.</u>,

¶ N.  He was immediately counseled and later disciplined for his response.  Id.  This incident would have repercussions for Joyce and his shift.

On March 1, Plaintiff had been out for two days due to back pain, but came in to work despite his condition because he had previously committed to help with interviews that day.  Id., ¶ Q.  When the interviews were over, Gilles told Joyce that he wanted to see him.  Id.  In response, Joyce phoned Gilles to explain that he was only there for interviews, that he was experiencing terrible back pain, and that he was at work against his doctor's orders.  Id.  Gilles insisted nonetheless that he and Joyce meet.  Id.

In that meeting, Gilles informed Plaintiff that his shift would be changing.  Starting March 12, Joyce would work from 9:00 a.m. to 5:00 p.m., so that he could "shadow" Reeves and improve his performance, as well as that of the day shift he managed.  Id., ¶¶ R, T.  The change, Gilles told Joyce, was precipitated by Reeves's not taking responsibility for the Senate Rotunda incident.  Id., ¶¶ E, R.  Joyce told Gilles that he believed this to be a bad idea.  Three quarters of the staff who reported to Joyce worked the night shift, and the change would remove senior management entirely during the hours of 6:00 a.m. to 9:00 a.m. – a critical transition time for the unit.  Id., ¶¶ R, T.  Joyce also explained the difficult position the change put him in; if forced to work the new shift, he would no longer be able to continue his role as the primary caregiver for his grandchildren.  Id., ¶¶ R, Y, NN.  Gilles was not sympathetic, telling Joyce summarily that that was his "problem."  Id., ¶ Y.  He also relayed to Joyce that the decision was final and unappealable and had been made by himself, Taxiarxis Tzamaras (Joyce's second-level supervisor), and Morey.  Id., ¶¶ R, W.  Gilles, for his part, denies ever meeting with Joyce on March 1, but at this stage, the Court must credit the testimony of the non-moving party.

After working another hour and a half, Joyce called Gilles and left a voice message indicating he was going home because of his back.  Id., ¶ YY.  Plaintiff returned to work on March 12.  Id., ¶ T.  At that time, Gilles read Joyce a memo that required him to change his shift to 8:00 a.m. to 4:30 p.m., effective March 19, 2012.  Id.  The following day, March 13, Joyce wrote an email entitled "Forced Retirement" to the Chief Operating Officer of the AOC, Christine Merdon.  Id., ¶ W.  In the email, he stated that the effective date of his retirement was April 30, 2012, which would allow him "the opportunity to use the remainder of [his] sick leave."  DSOF, ¶ 35.  Joyce also spoke with Merdon by telephone the next day, explained that he would rather keep working, but reiterated that if forced to retire, he wanted to use his remaining sick leave.  See PROF, ¶ BB.  That same day, Morey instructed Gilles to accept Joyce's offer to retire.  Id., ¶ AA.  On March 19, after returning from leave, Joyce worked the new shift that day, after which he was informed that his retirement had been finalized and that he would no longer need to work the new shift.  Id., ¶¶ AA-EE.  After exhausting his sick leave, Joyce then retired on April 30.  Id., ¶ JJ.

Joyce brought this suit against the AOC on November 13, 2012.  After this Court ruled on Defendant's earlier Motion to Dismiss, three counts remained under the Congressional Accountability Act of 1995, 2 U.S.C. § 1301 *et seq.*: age discrimination (Count II), retaliation for taking family and medical leave (Count IV), and interference with family and medical leave (Count V).  See Joyce v. Office of Architect of Capitol (Joyce I), 966 F. Supp. 2d 15, 21 (D.D.C. 2013).

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986); Holcomb v. Powell,

433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at

895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion"

by "citing to particular parts of materials in the record" or "showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

   When a motion for summary judgment is under consideration, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty

Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.

Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary

judgment, the Court must "eschew making credibility determinations or weighing the evidence."

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

   The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant,

in other words, is required to provide evidence that would permit a reasonable jury to find in her

favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

### III.   Analysis

Most federal antidiscrimination statutes exempt Congress from their coverage.  See, e.g., 42 U.S.C. § 2000e-16(a) (extending Title VII of Civil Rights Act of 1964 to federal judicial and executive employees, but not legislative ones).  Instead, legislative-branch employees, including AOC employees, must bring discrimination claims under the Congressional Accountability Act. Although the Act has its own unique set of procedural requirements, in substance it expressly incorporates protections and remedies from the generally applicable federal antidiscrimination statutes.  See 2 U.S.C. § 1302.  Claims relating to race, national-origin, gender, and disability discrimination thus explicitly track their ordinary federal analogs.  See 2 U.S.C. § 1311(a)(1) (incorporating parts of Title VII of the Civil Rights Act of 1964); 2 U.S.C. § 1311(a)(3) (incorporating parts of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990).  Similarly, though the Act's anti-retaliation provision, 2 U.S.C. § 1317(a), contains no express tie to other statutes, courts routinely refer to Title VII case law in evaluating claims of retaliation under the CAA.  See Joyce I, 966 F. Supp. 2d at 22; Herbert v. Architect of Capitol, 766 F. Supp. 2d 59, 74 n.13 (D.D.C. 2011); Newton v. Office of Architect of Capitol, 905 F. Supp. 2d 88, 92-93 (D.D.C. 2012).

With that framework in mind, the Court will proceed to separately analyze the three remaining counts of Joyce's Complaint.

### A.   Age Discrimination

The federal-sector provision of the ADEA provides: "All personnel actions affecting employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  As the D.C. Circuit has instructed, Joyce can proceed on such a claim in one of two ways.

"First, [he] can make use of the <u>McDonnell Douglas</u> evidentiary framework to establish that age was the but-for cause of the challenged personnel action." <u>Ford v. Mabus</u>, 629 F.3d 198, 207 (D.C. Cir. 2010); <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).  Under this rubric, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  <u>See</u> <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981); <u>Kersey v. Washington Metro. Area Transit Auth.</u>, 586 F.3d 13, 17 (D.C. Cir. 2009).  To accomplish this, a plaintiff must show that "(1) [he] is a member of a protected class" (*i.e.*, at least 40 years of age); "(2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." <u>Barnette v. Chertoff</u>, 453 F.3d 513, 515 (D.C. Cir. 2006) (citation omitted).  Defendant then has the burden to rebut that *prima facie* case with evidence of "a legitimate, nondiscriminatory . . . reason for its actions." <u>Kersey</u>, 586 F.3d at 17 (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000) (internal quotation marks omitted)).  "This burden is one of production, not persuasion; it can involve no credibility assessment." <u>Reeves</u>, 530 U.S. at 142 (internal quotation marks omitted) (citation omitted).  Finally, if the defendant has produced such evidence, then the plaintiff must show by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Id.</u> at 143 (internal quotation marks omitted).  This three-step process differs slightly at the summary-judgment stage.  At this point in the proceedings, if the defendant can offer a legitimate reason for the challenged action, then district courts may skip over the first step of the analysis, since in such circumstances "the *prima facie* case is a largely unnecessary sideshow." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008).

"Second, [Plaintiff] may establish liability by showing that age was <u>a</u> factor in the challenged personnel action." <u>Ford</u>, 629 F.3d at 207 (emphasis original).  Under this approach, a plaintiff may prevail even "where the employer acted with mixed motives."  <u>Id.</u> at 203.  "Specifically, 'once a plaintiff . . . shows that [discriminatory animus] played a motivating part in an employment decision, the [employer] may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [discriminatory animus] to play such a role.'"  <u>Id.</u> at 203-04 (quoting <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 244-45 (1989)) (alterations original).  Although Plaintiff "may establish section 633a liability" on the mere showing that "age was a factor in the [AOC's] decision," this will entitle him only to "declaratory and possibly injunctive relief," but not "instatement and backpay."  <u>Id.</u> at 207.  "For those types of remedies, a but-for standard of causation is necessary . . . ."  <u>Id.</u>

In the present case, Plaintiff seems to draw on both approaches, but the precise analytical framework does not matter.  Joyce has ultimately failed to provide sufficient evidence that his age was even a motivating factor in the challenged action.  <u>See</u> <u>Gold v. Gensler</u>, 840 F. Supp. 2d 58, 65 (D.D.C. 2012) (finding that "plaintiff . . . failed to meet her burden of proof on either theory" in ADEA claim).

Before proceeding, the Court notes that in his Complaint, Joyce identified two allegedly "adverse actions" underlying his age-discrimination claim: the shift change and the resultant constructive discharge.  <u>See</u> Am. Compl., ¶¶ 120, 127, 140-42.  The Court need not resolve whether these two actions individually or separately constitute an adverse action, however; even assuming that they did, no reasonable jury could find that the shift change that precipitated Joyce's resignation was motivated by his age.

Because Defendant has provided evidence of a legitimate, non-discriminatory reason for its action, the Court will begin there.  It will then move on to Plaintiff's evidence that such a reason was false and that, in fact, age discrimination was a motivating factor in the AOC's decision.

>   *1.  The AOC's Stated Reason*

According to the AOC, "[T]he events that led up to th[e] decision [to change Plaintiff's shift] had been a year plus in the making."  <u>See</u> Mot., Deposition of Robin Morey at 74:7-9. Joyce was in charge of both the night and day shifts, but the two were not working at equal capacity.  While the night shift thrived, the day shift suffered from several shortcomings:

> There w[ere] continual failures of work order assignments.  There w[ere] continual . . . employee conduct issues . . . specific to the day [shift].  There was a lack of consistency or a lack of quality in the work products, written, that were coming back from that branch . . . .  And there was a lack of quality . . . with regards to the management reports . . . where we tracked metrics.

Mot., Deposition of Taxiarxis Tzamaras at 90:7-19.  In addition, Joyce, for his part, was not "tak[ing] ownership of some of the [day-shift] issues."  <u>Id.</u> at 159:7.

Then in mid-February 2012, the AOC had to deal with the Senate Rotunda incident.  In the meeting that followed, day-shift supervisor Reeves refused to take responsibility in a manner that the AOC expected of its managers; he was both counseled and disciplined for his response. <u>See</u> PROF, ¶¶ M, N.  According to the AOC, although Gilles had begun to draft Joyce's shift-change memo before this incident, this confrontation accelerated its decision to move Joyce's tour of duty to overlap with Reeves's.  <u>See</u> Mot., Deposition of Jean Gilles at 61:2-3.

The AOC's reasons for changing Joyce's shift are articulated in the memo Gilles then presented him on March 12, 2012.  Gilles began by noting that "[s]ince Mr. Robert Washington was selected as the Night Building Superintendent, the performance of the Night

Labor and Custodial Section has improved dramatically and is now functioning at a highly successful level and accordingly requires less of your oversight."  Mot., Exh. H (March 5, 2012, Memorandum).  On the other hand, he observed, "the Day Labor and Custodial Section continues to lack leadership, coordination between work units, program development and implementation, and management direction that will lead to our desired improvement in service quality and productivity."  Id.

Gilles specifically highlighted the fact that "[d]evelopment of subordinate supervisors in the Day Labor and Custodial Section is inconsistent and haphazard; they lack critical knowledge of basic Agency policies and operating procedures; they are distracted by trivial, unessential personnel issues and have shown serious errors in judgment when trying to resolve such issues; and they have shown program execution ineffectiveness."  Id.  In fact, Reeves "admittedly stated that he avoids communicating with several of his direct reports, and resultantly has created a negative atmosphere with his subordinates, thereby fostering a culture that lacks personal accountability, trust and teamwork."  Id.

Gilles thus directed: "[Y]our major focus here forth will be administrative and technical supervision necessary to improve the performance, quality and productivity of the Day Labor and Custodial Section.  In order to drive this culture change, I have determined that it is necessary to change your tour of duty to 8:00am to 4:30pm, Mondays through Fridays, beginning on March 19, 2012."  Id.  "In so doing," Gilles concluded, "you will be required to develop work improvement plans and programs" to improve the shift.  Id.

It is worth noting here that these facts are not typical in the employment-discrimination context, and they tend to make the AOC's reason for the shift change all the more persuasive. An employer generally defends an adverse action as an appropriate sanction for that employee's

conduct or performance.  In this case, by contrast, the AOC avers that it changed Joyce's shift

largely because of his <u>colleague's</u> shoddy work.  This is a legitimate, non-discriminatory reason

for the action Plaintiff challenges.

       *2. Pretext*

      With that explanation in hand, the Court turns next to the question of whether Joyce

could convince a reasonable jury that the AOC's purported need to shore up the day shift was

pretextual and that the shift change was actually motivated by age discrimination.  His arguments

on this front are not always easy to distill, however, due to the confusing manner in which he

responded to Defendant's Statement of Facts.  Local Civil Rule 7(h) requires the party opposing

a motion for summary judgment to submit a "concise statement of genuine issues setting forth all

material facts as to which it is contended there exists a genuine issue necessary to be litigated,

which shall include references to the parts of the record relied on to support the statement."  This

rule "places the burden on the parties and their counsel, who are most familiar with the litigation

and the record, to crystallize for the district court the material facts and relevant portions of the

record."  <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 101 F.3d 145, 151 (D.C.

Cir. 1996).

      Joyce's "Record of Facts," conversely, often fails to identify exactly what part of

Defendant's facts are in dispute and devolves instead into lengthy recitations of facts Plaintiff

apparently wishes to list.  As a consequence, many "of [the] purported facts . . . simply are not

directly relevant to opposing the discrete facts put forward by the AOC."  <u>Herbert v. Architect of</u>

<u>the Capitol</u>, 766 F. Supp. 2d 59, 64 (D.D.C. 2011).  While the Court endeavors to credit

Plaintiff's account of the facts where he has identified a clear dispute, "[n]evertheless, to the

extent there has been any confusion as to the extent of [Joyce's] agreement or disagreement with

the AOC's proffered facts, the Court underscores that the fault and accountability for any such confusion must rest with [Joyce], and not the AOC or this Court." Id.

Pleading deficiencies aside, Plaintiff does dispute the AOC's rationale for the shift change, raising some relevant challenges and others that are both speculative and nonmaterial. The Court will treat only those that arguably undercut the AOC's stated reasoning. On this front, Joyce makes two arguments. First, he claims that a reasonable jury could conclude that the AOC's proffered reasons are false, and second, he contends that such a jury could also determine that age discrimination was the real reason the AOC changed his shift. Both are relevant to Joyce's claim because, at this stage, the Court must "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]?" Brady, 520 F.3d at 494; see also Gilbert v. Napolitano, 670 F.3d 258, 261 (D.C. Cir. 2012) ("'[E]ven if [the employee] show[s] that [the asserted reason] was not the actual reason for his [adverse employment action], he still would have to demonstrate that the actual reason was a . . . discriminatory [or retaliatory] reason.'") (quoting Brady, 520 F.3d at 496 n.4) (alterations original). The Court, therefore, analyzes Joyce's arguments in turn.

a.   Falsity of Proffered Reasons

As to the first showing – the falsity of the AOC's proffered reason – Plaintiff's central argument is that there simply was no problem to fix. He supports this assertion primarily with his own independent evaluation of the day division and the claim that there are "no documents showing a systematic qualitative difference between the Labor and Custodial Branch night and day shifts." PROF, ¶¶ A, B. Because the AOC has "provided little to no independent, non-

testimony, evidence to support its nondiscriminatory rationale," he concludes, this Court should find "a genuine issue of material fact." Opp. at 12-13 (citing Norman v. Vilsack, No. 12-730, 2014 WL 7410048, at *4 (D.D.C. Dec. 30, 2014)).

Plaintiff's arguments miss the mark. For instance, although he denies that there were meetings "to improve [his] oversight of the day shift or to discuss the performance metrics of the day shift," he simultaneously concedes that such bi-weekly meetings were "meant to resolve interpersonal issues between the day shift supervisors . . . ." PROF, ¶ B. Joyce, moreover, makes clear that, even in his opinion, the performance of Michael Francis (who reported to Reeves) was an issue. Id., ¶ G. "Francis was a poor supervisor," Plaintiff laments, who "spent a good deal of the time in his office sleeping or eating." Id. He also does not dispute that Reeves responded inappropriately when confronted with the problem of the Senate Rotunda – a response memorialized in a counseling letter. Joyce's concessions on this front, together with evidence corroborating Reeves's failings, adequately support the AOC's assertion that there were shortcomings that might be remedied by placing Joyce on the day shift full time. And when considering an employer's rationale for its actions, "a court must not act as 'a super-personnel department that reexamines an entity's business decisions . . . .'" Barnett, 715 F.3d at 359 (quoting Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (citation omitted)). Ultimately, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence[,] . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." Brady, 520 F.3d at 495.

Plaintiff next contends that the AOC's reasoning must be false because the shift change did not make any sense. It "meant that there would be no management oversight from[] Joyce, Washington, or Reeves, the heads of the Labor and Custodial Branch, during the hours of 6:00

a.m. to 8:00 a.m." Opp. at 13. As the AOC points out, however, "Gilles, the supervisor of

Washington and Reeves," together with three of Reeves's subordinates, worked during that

period. See Reply at 9. The fact that Plaintiff might have approached the problem differently

does not render Defendant's solution pretextual.

Joyce further argues that pretext is apparent from the way the AOC presented the shift

change. He takes issue with the fact that his supervisors did not discuss the action with him

before implementing it. This lack of any back-and-forth, Plaintiff claims, demonstrates pretext.

He is wrong. There is no policy requiring the AOC to discuss shift changes with it employees.

See Mot., Exh. T (AOC Human Resources management Manual) ("Whenever the AOC's needs

differ from established basic workweeks and tours of duty, officials authorized to establish basic

workweeks and tours of duty may reschedule an employee's basic workweek or tour of duty . . . .

Advance notice, if practicable, will be given to employees.") (emphasis added). Joyce might

take offense at the presentation of the shift change, but that does not make the AOC's reasons for

implementing it false.

Plaintiff next asserts that the Senate Rotunda issues would be both day- and night-shift

problems. See PROF, ¶ M. No area under the AOC's supervision could have gotten so dirty, he

maintains, without a failure of the entire staff. Id. Even if true, however, that does not change

the fact that Reeves's response when confronted with the failure was inappropriate and that this

provided the AOC with a reason to have Joyce work with him and those he supervised.

Finally, in what is perhaps Joyce's strongest evidence, he points to instances in which he

believes that shift changes were used by management as a means to reprimand or force out

employees – two of whom it appears ultimately retired. See PROF, ¶ U; Reply at 11. Even if he

is right about those other employees, however, that fact does not undermine the AOC's

14

documented and supportable rationale for changing <u>his</u> shift.  And the AOC has provided ample

evidence that it changes the shifts of employees at nearly every level of management all the time

in order to better manage its operations.  <u>See</u> Morey Dep. at 84:16-22; 85:1-13; 123:17-124:2;

132:20; Gilles Dep. at 67:2-3; 130:7-22; 131:1-18; 134:6-10; Tzamaras Dep. at 122:5-19;

200:17-22; Mot., Exh. V (April 11, 2008, Email from Joyce to Dennis Campbell regarding shift

change of another employee); <u>id.</u>, Exh. X (January 6, 2009, Email from Tzamaras to Marvin

Simpson regarding shift change of another employee).  Joyce, moreover, does not contest the

fact that in response to his resignation, the AOC detailed Washington to fill the position Plaintiff

would have filled had he not retired – the 8:00 a.m. to 4:00 p.m. shift – which Washington now

works three days a week, while covering Joyce's old shift the remaining two.  <u>See</u> DSOF, ¶ 43;

Gilles Dep. at 134:6-10.

### b.  Evidence of Discrimination

        Even were Joyce able to undermine the validity of the AOC's reasons for the shift change

(which he has not done), his claim nonetheless fails to satisfy its central burden – namely,

"showing that age was <u>a</u> factor in the challenged personnel action."  <u>Ford</u>, 629 F.3d at 204

(emphasis original).  On this front, Joyce argues that "[t]he AOC's discriminatory intent can be

seen from a number of statements."  Opp. at 27.  Two of these occurred in 2011.  The first is

found in the June 17, 2011, denial of his request for a flexible work schedule, in which Gilles

stated that Joyce's "sick and annual leave balances [were] very low considering [his] accrual rate

and the amount of time [he had] been employed . . . ."  Mot., Exh. DD (FWS Denial).  Plaintiff

seizes on the fact that the AOC – in rendering this decision – relied at least in part on "the

amount of time" he had been with AOC and divines from this ageist motivations.  The Court

fails to see the connection.

15

The AOC's non-discriminatory reason for considering the length of Joyce's tenure is clear on the face of the memo – that is, the amount of leave an employee has taken can be derived from his leave balance as compared to the time he has had to accrue leave. This calculation was relevant in considering applications for an FWS. In a memo outlining the contours of the program, the AOC made clear that, among other things, to be eligible for participation, an employee must have had an "established pattern of regular work attendance" and an "established pattern of requesting leave in advance." Mot., Exh. CC (October 21, 2008, FWS Memorandum) at 2. As it turns out, although Plaintiff had accumulated a large amount of leave over his thirty-nine-year career, in the years leading up to the FWS denial he had been essentially using leave as quickly as he acquired it. See Mot., Exh. FF (Annual Attendance Records). As of June 17, 2011, moreover, he had worked only three full pay periods out of 62 possible in the prior two and a half years without using annual or sick leave. See June 17, 2011, FWS Denial. Taking the evidence together, no discriminatory intent could be gleaned from the AOC's reference to the length of Joyce's tenure in this context.

The second statement Plaintiff identifies arose when he went to speak with Morey about the FWS denial. In this conversation, Joyce "stated to Mr. Morey . . . that he and leadership obviously were operating under the mistaken belief that [Joyce] was using up [his] leave in preparation for retirement." See June 29, 2011, Formal Grievance. According to Plaintiff, Morey indicated in response that "that 'might' be the perception but the denial was based on total hours used." Id. In briefing, Plaintiff labels this an "ageist" statement, but it is again difficult to see exactly how that follows. To begin, there is nothing inherently ageist about an employer's concerning itself with an employee's potential abuse of leave – even if the employee's leave-taking is motivated by proximity to retirement. And it was Plaintiff who theorized in this

conversation that his denial had anything to do with retirement.  Morey – even on Plaintiff's account – said in response only that that "might" be his perception, while emphasizing nonetheless that the denial was based on use of leave.

Even if the FWS denial and Morey's conversation with Joyce somehow revealed an ageist perspective, moreover, "'stray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff." Simms v. U.S. Gov't Printing Office, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000); see also Vilsack, 760 F. Supp. 2d at 51 (same).  Both of these communications are temporally removed from and ultimately unrelated to the decision to change Joyce's shift; they cannot, therefore, support an inference of discrimination as to that later action.  See Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993) (holding that comment by plaintiff's direct superior to him that "'[w]e don't necessarily like grey hair,'" together with "an interview of [defendant's] Vice President of Personnel in which he stated, 'We don't want unpromotable fifty-year olds around'" insufficient to demonstrate "that the discharge occurred under circumstances giving rise to an inference of age discrimination").

Plaintiff's next batch of evidence – although closer in time to the allegedly adverse action – is even weaker.  He claims that in early February 2012, he told Gilles that he was "considering retirement, stating that, between his back and taking care of his grandkids, Joyce needed to think about how long he could to do this job."  PROF, ¶ K.  A few days later, he notes, the AOC decided to change his shift.  Id., ¶ O.  Specifically, it was on February 13, 2012, that Tzamaras provided Gilles with a template for the shift-change memorandum, which Gilles then drafted and returned to Tzamaras on February 24, 2012.

Joyce also points out the fact that he discussed possible retirement again with Gilles on March 1, 2012 – that is, in the same meeting he learned of the shift change.  The next day, Tzamaras returned to Gilles a rewritten draft of the memorandum with changes that included removal of the following line: "I will consider an alternative schedule as long as I feel it meets the requirements for allowing considerable interface with all aspects of your operations."  Mot., Exh. I (February 23, 2012, Draft Memorandum).  According to Plaintiff, age-based motivation is revealed by the fact that AOC management both initiated his shift change and made the disputed edits to the memo in close proximity to his discussions of retirement.  The Court disagrees.

First, there is nothing inherently suspicious about an employer's discussing with an employee his consideration of retirement – especially in light of the fact that, by Joyce's account, he himself did all the talking.  An employer cannot be exposed to liability every time an employee broaches the topic of retirement and then subsequently suffers an allegedly adverse action.  See Perry v. Shinseki, 783 F. Supp. 2d 125, 138 (D.D.C. 2011) ("Perry claims that when she told Lenox that she planned to apply to be Chief, Lenox asked her how many years she had until retirement.  Lenox was the ultimate decision-maker, and her statement was allegedly made in direct response to Perry bringing up the job opening.  However, the Court cannot view this as evidence of discriminatory animus . . . ."), aff'd, 466 F. App'x 11 (D.C. Cir. 2012) ("[N]othing in the record suggests that Perry's age . . . played any role whatsoever – whether as a but-for cause or as a motivating factor – in VA's decision.").  Yet even if it had been Gilles inquiring about retirement, this fact alone would still not suffice to raise an implication of age-based discrimination.  See, e.g., Vilsack, 692 F. Supp. 2d at 118 n.5 (no evidence of discriminatory intent where supervisor made repeated inquiries about retirement plans in Title VII hostile-work-environment claim).

Finally, Plaintiff alleges that Morey admitted in a March 14, 2012, email – that is, after Joyce resigned – that he believed Joyce was preparing for retirement all along.  See Opp., Exh 17 (March 14, 2012, email from Morey to Merdon).  This piece of evidence, however, much like Plaintiff's others, simply does not mean what he wants it to.  In the email, Morey explained to Merdon, that: 1) He was accepting Joyce's resignation; 2) Joyce had been "notified that he [could] not simply burn his sick leave as he approache[d] his specified resignation date"; and 3) Joyce would have to "follow policy and provide appropriate documentation for his absences." Id.  Morey then attached records, which he considered evidence of Joyce's prior "steady abuse of sick leave."  Id.  According to Morey, Joyce had "booked sick leave around holidays, weekends, coupled with annual leave and numerous occasions of using sick leave in 2 day increments to comply with policy which further triggers our suspicion of abuse."  Id.

In light of this record, Morey then noted that "[t]his steady use of sick leave is in keeping with, what we believe is, his intent to burn the leave as he approaches resignation/retirement." Id. (emphasis added).  Read in context, this email shows that after Joyce resigned, Morey was concerned that previous patterns of leave-taking – which he considered inappropriate – might spill over into Joyce's practices as he approached retirement.  Indeed, Plaintiff had already made explicit his intention to use his remaining sick leave in his email to Merdon the day before.  See DSOF, ¶ 35 (seeking a retirement date that would allow him "the opportunity to use the remainder of [his] sick leave").  Yet even if, as Plaintiff alleges, this somehow shows that Morey had been concerned about Joyce's use of leave in anticipation of retirement "all along," that concern was clearly about use of leave.  The AOC does not and need not deny that it was concerned with Joyce's leave regardless of his motivation for taking it.

\* \* \*

In conclusion, "the court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he had suffered discrimination." Aka, 156 F.3d at 1290.  The AOC here has provided a non-discriminatory reason to change Joyce's shift, and "nothing in the record suggests that [Joyce's] age . . . played any role whatsoever – whether as a but-for cause or as a motivating factor – in [the AOC's] decision." Perry, 466 F. App'x 11; see also Aka, 156 F.3d at 1290 ("[T]here may be no legitimate jury question as to discrimination in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record that no discrimination has occurred."); Ford, 629 F.3d at 206 ("emphasiz[ing] that the consideration of age must have some connection to the challenged personnel action").  The Court, therefore, concludes that no reasonably jury could find the AOC's decision was motivated by age.

B. FMLA Retaliation

Count IV alleges retaliation for taking family and medical leave.  Retaliation occurs under the FMLA when an employer "discharge[s] or in any other manner discriminate[s] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2); see also Shaffer v. Am. Med. Ass'n, 662 F.3d 439, 443 (7th Cir. 2011).  Just as in Title VII, to prove FMLA retaliation, a plaintiff must show that (1) he engaged in a protected activity under this statute; (2) his employer took a materially adverse action against him; and (3) the employer took the action because of his protected activity.  See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010) (frameworks for FMLA retaliation and Title VII retaliation are "essentially the same"); see also Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1367-68 (D.C. Cir. 2000).

In University of Texas Southwest Medical Ctenter v. Nassar, 133 S. Ct. 2517 (2013), the Supreme Court recently held that to prevail on a retaliation claim under Title VII, a plaintiff must meet the "traditional principles of but-for causation." Id. at 2533. Showing that the protected activity was merely a "motivating factor" in an employer's adverse action is thus insufficient. Id. The D.C. Circuit has yet to interpret the effect of this decision in the FMLA-retaliation context, and lower courts in other circuits have come to differing conclusions. See Nigh v. Sch. Dist. of Mellen, No. 13-183, 2014 WL 4794521, at *19 (W.D. Wis. Sept. 25, 2014) (collecting cases). Because Plaintiff's claim fails under either standard, the Court will not linger over the question here.

Joyce's FMLA-retaliation claim is analyzed under the McDonnell-Douglas framework. See Moran v. U.S. Capitol Police Bd., 887 F. Supp. 2d 23, 30 (D.D.C. 2012) (analyzing CAA retaliation claim pursuant to McDonnell-Douglas). Because the AOC has presented a non-retaliatory reason for changing his shift, therefore, it is Plaintiff's burden to show both this reason was pretextual and that his leave-taking was the real reason his shift was changed. (The Court, again, need not resolve the adverse-action dispute in order to grant summary judgment.)

Joyce's allegations on this front have morphed a bit from their presentation in the Complaint. There he claimed that he took sick leave from March 5, through March 12, 2012. See Am. Compl., ¶ 78. Then he came in to help with interviews afterward – on March 13 – at which point Gilles presented him with the memo that changed his tour of duty. Id., ¶ 81. On this timeline, he alleged that the AOC switched his shift (and thus forced him to resign) in retaliation for protected medical leave he took immediately before the switch. Id., ¶¶ 130-45.

This timeline is no longer the one Plaintiff endorses. Instead, "through discovery, Joyce [has] learned that his actual days of leave were February 28, 2012 until March 12, 2012," and

that "the date he helped . . . with an interview" was within that period – March 1 – instead of

after.  See Opp. at 32.  This, he further alleges, was the day he first spoke to Gilles about the shift

change, rather than upon his return.  Id.  On this timeline, Plaintiff's theory runs as follows:

Joyce's March 1, 2012, conversation with Gilles served as the main notice he gave AOC that he

was taking FMLA leave, which he then took until his return on March 12.  Upon returning,

Gilles "read to Joyce" the memo requiring him to change his tour of duty – thus, Joyce

concludes, retaliating for his leave-taking.  Id. at 6.

     As Defendant points out, however, the shift change was in the works for at least two

weeks before Joyce even gave notice of his intention to take FMLA-qualifying leave.  The AOC

contends, therefore, that even if the shift change constituted an adverse action, Plaintiff cannot

demonstrate that it took that action because of his protected activity.  See McFadden, 611 F.3d at

6.  Plaintiff, for his part, does not dispute that the shift change was "conceived of prior to [his]

FMLA leave."  Opp. at 39.  He argues nonetheless that his taking leave caused the AOC to

change the manner in which the shift change was presented to him.  Specifically, he again points

to the fact that Tzamaras edited the shift-change memorandum to no longer offer the option of

suggesting alternatives the day after he gave notice he would be taking leave.  This removal

Plaintiff takes as evidence of causation: "[T]here is extremely close temporal proximity," he

suggests, "between . . . informing the AOC of his need for FMLA-qualifying leave and

Tzamaras' revisions which led to Joyce's shift change and constructive discharge because Joyce

no longer had the opportunity to suggest alternatives."  Id. at 36.  In other words, Plaintiff

contends, his shift would not have changed absent his informing the AOC of his intention to take

medical leave.  The Court is not persuaded that this raises a dispute of material fact.

In the first place, although Joyce speculates that his giving notice to Gilles motivated Tzamaras to remove the suggestion option, he fails to offer any evidence showing that Gilles and Tzamaras ever actually spoke about the former's conversation with Joyce.  His causal implication is further undercut by the fact that Tzamaras completely rewrote Gilles's draft.  As Defendant points out, "While Plaintiff appears to intimate that the purported language regarding something 'other than a shift change' was the only language changed in the draft memo, a comparison of the draft memo and the final memo reveals that virtually no sentence of the draft memo remained the same."  Reply at 6.  In short, there is very little connecting his leave-taking to Tzamaras's editing of the memo.

Joyce's argument falters completely, moreover, in concluding that his shift was changed because he no longer had the opportunity to suggest alternatives.  The draft memorandum extant before his leave-taking presented the shift change as a *fait accompli*: "[B]eginning on March 12, your assigned tour of duty will be first shift Monday through Friday from 9:00am to 530pm." February 23, 2012, Draft Memorandum (emphasis added).  That Gilles also provided the option to suggest "an alternative schedule" does not change the fact that the shift change was scheduled for a date certain.  And it in no way guaranteed that any alternative schedule would, in fact, be accepted by the AOC.  In other words, "Tzamaras' revisions" did not "[lead] to Joyce's shift change."  Opp. at 36.

At the end of the day, all Plaintiff can really show is that language offering him the option of suggesting alternatives to an impending shift change was removed from a draft memorandum at the time he notified the AOC of his intention to take leave.  Even if this rewrite had anything to do with his leave-taking, however, the fact would not change that management had already planned his shift change at the time.  In light of the AOC's articulated reasons for

changing his tour of duty and considering Plaintiff's failure to connect that decision to his protected activity, the Court concludes that no reasonably jury could find that the shift change was implemented in retaliation for his taking FMLA leave.

C. <u>FMLA Interference</u>

Count V alleges interference with family and medical leave.  The AOC interfered, according to Joyce, by refusing to restore him to an equivalent job when he returned from medical leave.  <u>See</u> Am. Compl., ¶¶ 146-55.  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  One such protected "right" is, upon returning from protected leave, "(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).

In other circuits, "[t]o prevail on an FMLA-interference theory, the plaintiff employee must prove that: (1) [he] was eligible for the FMLA's protections; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to take leave under the FMLA; (4) [he] provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which [he] was entitled." <u>Pagel v. TIN, Inc.</u>, 695 F.3d 622, 627 (7th Cir. 2012) (internal quotation marks omitted); <u>see also</u> <u>Hodges v. District of Columbia</u>, No. 12-1675, 2013 WL 4047197, at *6 (D.D.C. Aug. 12, 2013) ("To state an FMLA interference claim, a plaintiff must allege facts sufficient to show, among other things, that (1) he was entitled to take leave because he had a 'serious health condition,' (2) he gave his employer adequate notice of his intention to take leave, and (3) his employer denied or otherwise interfered with his right to take leave.")

(citation omitted).  "Unlike the negative right given by most discrimination statutes (*i.e.*, against adverse actions), Section 2614 bestows a positive right to return to a job with 'equivalent . . . terms and conditions of employment' – a right Joyce claims was violated here by the new hours."  Joyce I, 966 F. Supp. 2d at 29 (quoting 29 U.S.C. § 2614(a)(l)).  According to Joyce, the "AOC interfered with [his] right to take FMLA leave by neither returning him to the same position he held when his leave commenced, nor restoring [him] to an equivalent position with equivalent terms and conditions of employment . . . ."  Opp. at 37 (citing 29 U.S.C. § 2614(a)(l)).

As this Court noted in its previous Opinion, however, "[T]he AOC could avoid liability by showing that Joyce's shift would have changed regardless of whether he took leave."  Joyce I, 966 F. Supp. 2d at 29 (citing Goelzer v. Sheboygan County, 604 F.3d 987, 993 (7th Cir. 2010)).  Given the draft memoranda that predate his protected leave-taking, it is difficult to see how it could be otherwise.  In an attempt to save his claim, nonetheless, Plaintiff again adverts to the changed language in the shift-change memorandum: "[I]t [was] only after Joyce inform[ed] the AOC of his need for FMLA leave . . . that the AOC decide[d] Joyce [could not] provide an alternative means to his shift change . . . ."  Opp. at 39.  "It [was] this decision," Plaintiff concludes, "that prevent[ed] Joyce from returning to a substantially equivalent position."  Id. The Court again is not persuaded.  The decision to change Plaintiff's shift was the only one that could have arguably altered his position as required for an interference claim.  Taking the evidence together, it is indisputable that, not only would Joyce's shift have changed regardless of his leave-taking, it essentially already had.  The Court, therefore, will grant Defendant's Motion for Summary Judgment on this count as well.

**IV.    Conclusion**

For the aforementioned reasons, the Court will grant Defendant's Motion for Summary

Judgment.  A separate Order consistent with this Opinion will be issued this day.

<u>/s/ James E. Boasberg</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>May 27, 2015</u>